
DA 12-0312

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 10

PUBLIC LANDS ACCESS ASSOCIATION, INC.,

        Petitioner and Appellant,

   v.

THE BOARD OF COUNTY COMMISSIONERS OF
MADISON COUNTY, STATE OF MONTANA, and
C. TED COFFMAN, FRANK G. NELSON and
DAVID SCHULTZ, constituting members of said
Commission; and ROBERT R. ZENKER, in his
capacity as the County Attorney for Madison
County, State of Montana,

        Respondents and Appellees.

JAMES C. KENNEDY, MONTANA STOCKGROWERS
ASSOCIATION and HAMILTON RANCHES, INC.,

        Respondent/Intervenor and Cross-Appellant.

APPEAL FROM:    District Court of the Fifth Judicial District,
                    In and For the County of Madison, Cause No. DV-29-04-43
                    Honorable Loren Tucker, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

                J. Devlan Geddes (argued), Goetz, Gallik & Baldwin, P.C.; Bozeman,
                Montana

        For Appellees:

                Susan B. Swimley (argued), Attorney and Counselor at Law; Bozeman,
                Montana

                Tara DePuy, Attorney and Counselor at Law; Livingston, Montana

        For Appellee and Cross-Appellant:

Colleen M. Dowdall, Worden Thane P.C.; Missoula, Montana

Peter D. Coffman (argued), Matthew T. Parrish, Dow Lohnes PLLC; Atlanta, Georgia

For Intervenor State of Montana:

Timothy C. Fox, Montana Attorney General, Matthew T. Cochenour (argued), Assistant Attorney General; Helena, Montana

For Amici:

Rebecca R. Swandal, Swandal, Douglass & Gilbert, P.C.; Livingston, Montana
(*Attorney for Property and Environment Center*)

Matthew O. Clifford, Attorney at Law; Oakland, California
(*Attorney for Montana Council of Trout Unlimited*)

Margo B. Ogburn, Wittich Law Firm, P.C.; Bozeman, Montana
(*Attorney for United Property Owners of Montana*)

Argued: April 29, 2013
Submitted: May 15, 2013
Decided: January 15, 2014

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1 Public Lands Access Association, Inc. (PLAA) appeals from a 2012 judgment of the Fifth Judicial District Court, Madison County, denying the public access to the Ruby River at Seyler Lane and Seyler Bridge.

¶2 James Kennedy (Kennedy) cross-appeals from a 2008 judgment of the Fifth Judicial District Court, Madison County, granting PLAA summary judgment on the issue of public access to the Ruby River from Lewis Bridge. We affirm in part, reverse in part, and remand for further proceedings.

¶3 We have consolidated the appeal and cross-appeal issues into the following issues:

*1. Did the District Court correctly define the width of the public right-of-way at the intersection of Seyler Lane and the Ruby River?*

*2. In determining the width of the public right-of-way at the intersection of Seyler Lane and the Ruby River, did the District Court err by excluding evidence of recreational use?*

*3. Is the use of a public road right-of-way established by prescription limited to historic use, or does it extend to all public uses, including recreation?*

*4. Did the District Court err by rejecting certificates of survey (COS) as evidence of the width of the existing public right-of-way at the intersection of Seyler Lane and the Ruby River?*

*5. Did the District Court effectuate an unconstitutional taking of Kennedy's property when it ruled that the public may access the Ruby River via the right-of-way granted by the Lewis Lane deed?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Duncan District Road, Lewis Lane, and Seyler Lane are county roads in Madison County, Montana. All three roads cross the Ruby River by way of bridges. The bridges

3

were constructed by, and are currently maintained by, Madison County. Kennedy owns land that abuts the public rights-of-way on both Seyler Lane and Lewis Lane.

¶5    PLAA filed a complaint against Madison County in May 2004, alleging that individuals who owned property adjacent to the three bridges had erected fences along each county road to the ends of each bridge, preventing the public from using the rights-of-way to access the Ruby River. PLAA twice amended its complaint and ultimately sought, among other things, a declaratory judgment that the public may use Duncan District Road, Lewis Lane, and Seyler Lane, and their bridges and bridge abutments, to access the Ruby River. Kennedy intervened as a defendant.[1]

¶6    The parties moved for summary judgment, and, after holding a hearing on the matter, the District Court issued an order on October 1, 2008. The court held, in part, that the public rights-of-way at Duncan District Road and Lewis Lane are each 60 feet wide, and the public is entitled to use the entire 60 foot width to access the Ruby River. With respect to Seyler Lane, the court determined at the hearing that, because the right-of-way was established by prescriptive use as opposed to statutory petition (Duncan District Road) or dedication or grant (Lewis Lane), additional fact finding was necessary to determine the width of the right-of-way and whether the public could use it to access the Ruby River. Summary judgment pertaining to Seyler Lane was therefore denied, and a trial was ordered to resolve the remaining issues.

---

[1] The Montana Stockgrowers Association and Hamilton Ranches also intervened as defendants, but have since stipulated to being dismissed from the case.

¶7     The parties stipulated to the facts set forth below, through paragraph 15, prior to trial. Seyler Lane and Seyler Bridge were constructed by Madison County, but there are no records which verify the date of their original construction. Madison County re-constructed Seyler Bridge in its present location after a 1976 flood. Kennedy owns the fee title to the land underlying Seyler Bridge and the bridge approaches on Seyler Lane, including the bed and banks of the Ruby River. The Seyler Bridge surface is 24 feet wide. The area of the bridge surface between the guard rails on the bridge is 21.35 feet wide. The paved portion of the road approaching the bridge is approximately 20 feet wide and sits atop road fill that slopes down and away from the edge of the pavement. The bottom edge of the road fill is referred to as "toe of road fill."

¶8     In June 2004, Madison County issued Kennedy an "Encroachment Permit for Fence on County Bridge Right-of-Way Madison, Montana" (the "Encroachment Permit"). Pursuant to the Encroachment Permit, Kennedy installed private fences at three of the bridge corners at Seyler Bridge. Some of the fences are located at the toe of road fill, while others are inside or outside the toe of road fill. The fences do not impede, block, or intimidate the public from reaching the Ruby River.

¶9     Madison County has assumed jurisdiction over Seyler Lane and Seyler Bridge and is responsible for maintaining them. Madison County maintains the paved surface of Seyler Lane, including the toe and shoulder, as well as the areas beyond the travelled surface and adjacent subsurface, by mowing, snow plowing, and weed spraying. Madison County also maintains the subjacent and lateral support of Seyler Bridge, including the bridge abutments, wing walls, and bridge spans.

5

¶10 Finally, and of particular import to this appeal, the parties agreed upon the following fact:

> Seyler Bridge and its approaches on Seyler Lane is a county road right-of-way that was established by prescriptive use. There is no dispute that the public has the right to use the paved portion of Seyler Bridge and its approaches on Seyler Lane for travel across Seyler Bridge over the Ruby River.

¶11 A bench trial was held January 9-11, 2012, at which both parties presented exhibits and witness testimony. On April 16, 2012, the District Court issued its findings of fact, conclusions of law, and final judgment. We will refer to the findings and conclusions in more detail below. The gist of the District Court's decision, however, was that PLAA failed to prove the existence of a public prescriptive easement beyond the fences at Seyler Bridge by clear and convincing evidence.

¶12 The final judgment provides:

1. Westerly and southerly of the Seyler Bridge, the public has a prescriptive right to travel and to use Seyler Lane between the fences and likewise upon the Seyler Bridge.

2. Madison County has a prescriptive right independent and separate from public use to lateral and subjacent support for Seyler Lane and Seyler Bridge, together with such additional land as is reasonable and necessary for maintenance and repair.

3. Except as described in paragraph 2 above, there is no public right whatsoever on either side of Seyler Lane outside the fences or beyond the traveled way where there is no fence.

¶13 PLAA appeals this decision, and Kennedy cross-appeals from the court's order regarding the parties' motions for summary judgment.

**STANDARD OF REVIEW**

6

¶14     We review for clear error a district court's findings of fact.  *Boyne USA, Inc. v. Spanish Peaks Dev., LLC*, 2013 MT 1, ¶ 28, 368 Mont. 143, 292 P.3d 432.  Clear error exists if substantial credible evidence fails to support the findings of fact, if the district court misapprehended the evidence's effect, or if we have a definite and firm conviction that the district court made a mistake.  *Spanish Peaks*, ¶ 28.  We review for correctness a district court's conclusions of law.  *Spanish Peaks*, ¶ 28.

¶15     We review a district court's ruling on motions for summary judgment *de novo*, using the same M. R. Civ. P. 56 criteria used by the district court.  *Mt. West Bank, N.A. v. Cherrad, LLC*, 2013 MT 99, ¶ 25, 369 Mont. 492, 301 P.3d 796.

## DISCUSSION

¶16     The issues PLAA raises on appeal relate to one overarching question:  May the public use the Seyler Lane right-of-way to access the Ruby River?  This inquiry breaks down into two subsets of questions:  What is the width of the Seyler Lane right-of-way, and may the public use the right-of-way for recreational purposes?  We address these issues in turn.

¶17     *Issue One:  Did the District Court correctly define the width of the public right-of-way at the intersection of Seyler Lane and the Ruby River?*

¶18     The parties stipulated, and the District Court found, that Seyler Bridge and its approaches on Seyler Lane is a county road right-of-way that was established by prescriptive use.  Despite this finding, the court determined that the public could only use the portion of the right-of-way "between the fences and . . . upon the Seyler Bridge."  It reserved use of the areas necessary for maintenance and repairs, which included lateral and subjacent support for Seyler Lane and Seyler Bridge and "such additional land as is reasonable and necessary,"

7

exclusively for Madison County. By doing so, the District Court effectively split the public right-of-way into a narrower primary public right-of-way for travel and a wider secondary limited easement for maintenance and repairs, and explicitly excluded the public from using the County's secondary easement.

¶19 For the reasons stated below, we reverse the District Court's decision that the County has a secondary easement for purposes of construction, maintenance and repair that is separate from the public road right-of-way. In a public road right-of-way established by prescription, the areas necessary to support and maintain the road, as well as the land needed to make the road safe and convenient for public use, are included in the public right-of-way.

**Secondary Easements**

¶20 PLAA argues that, because Seyler Bridge and its approaches on Seyler Lane is a county road right-of-way acquired by prescriptive use, the public has obtained by prescription the right to use both the portion of the roadway actually traveled or paved and the land needed for the support and maintenance of the paved and traveled portion, including shoulders and ditches. PLAA asserts that the District Court's recognition of a secondary easement "was unnecessary and improperly limited the public's use of the rights acquired in the Seyler Lane prescriptive easement by granting a *de facto* private easement to the County for maintenance activities" (emphasis in original).

¶21 In support of finding that the county holds a secondary easement for repair and maintenance, the District Court relied upon the following cases: *Laden v. Atkeson*, 112 Mont. 302, 116 P.2d 881 (1941); *Guthrie v. Hardy*, 2001 MT 122, 305 Mont. 367, 28 P.3d 467; *Kelly v. Wallace*, 1998 MT 307, 292 Mont. 129, 972 P.2d 1117; and *Ferguson v.*

8

*Standley*, 89 Mont. 489, 300 P. 245 (1931). Unlike the case at hand, however, these cases all involved private easements. None involved a public road.

¶22 Our seminal case on secondary easements is *Laden*. There, the plaintiff landowners had an easement in a ditch that ran through the defendant's land. The defendant did not contest this right, but did challenge the plaintiffs' right to enter upon the defendant's lands in order to reach the ditch and to use lands on the sides of the ditch for maintenance and repair. We ruled for the plaintiffs and recognized that " '[t]he owner of a dominant estate having an easement, has the right to enter upon the servient estate and make repairs necessary for the reasonable and convenient use of the easement, doing no unnecessary injury to the servient estate.' " *Laden*, 112 Mont. at 306, 116 P.2d at 884 (internal quotations omitted). Such a right is called a "secondary easement," and is a "mere incident of the easement that passes by express or implied grant, or is acquired by prescription." *Laden*, 112 Mont. at 305-06, 116 P.2d at 883 (internal quotations omitted). We stated that the secondary easement "can be exercised only when necessary and in such a reasonable manner as not to needlessly increase the burden upon the servient tenement." *Laden*, 112 Mont. at 306, 116 P.2d at 884 (quotation omitted).

¶23 Since *Laden*, we have recognized secondary easement rights in a number of cases involving private ditch easements. *See e.g. Shammel v. Vogl*, 144 Mont. 354, 396 P.2d 103 (1964); *O'Connor v. Brodie*, 153 Mont. 129, 454 P.2d 920 (1969); *Sharon v. Hayden*, 246 Mont. 186, 803 P.2d 1083 (1990); *Kephart v. Portmann*, 259 Mont. 232, 855 P.2d 120 (1993); *Engel v. Gampp*, 2000 MT 17, 298 Mont. 116, 993 P.2d 701; *Musselshell Ranch Co. v. Seidel-Joukova*, 2011 MT 217, 362 Mont. 1, 261 P.3d 570. In 1981, the Montana

9

Legislature codified secondary easement rights. Section 70-17-112, MCA, provides that an owner of a canal or ditch easement has a secondary easement to enter the servient tenement to inspect, repair, and maintain the canal or ditch.

¶24 At issue in the present case, in contrast to a private easement, is a county road acquired by prescriptive use. When a county road is established, the public acquires the right-of-way "and the incidents necessary to enjoying and maintaining it." Section 7-14-2107(3), MCA. We previously have observed that Montana statutes "clarify that a public highway consists of more than the surface of a roadway," and is not "limited to the driving surface." *DeVoe v. State*, 281 Mont. 356, 369-70, 935 P.2d 256, 264 (1997). Our case law is also clear that the establishment of a public road by prescriptive use contemplates the general public's use of the roadway as well as the land needed for construction, repairs and maintenance. We do not separate the different uses to create two distinct interests—a public road for travel and a secondary easement for the County's maintenance—as the District Court did. Rather, we recognize one public road right-of-way. *See Rasmussen v. Fowler*, 245 Mont. 308, 312, 800 P.2d 1053, 1056 (1990) (finding a public prescriptive road easement based upon evidence of county maintenance of the road as well as other public uses); *McClurg v. Flathead County Comm'rs*, 188 Mont. 20, 24, 610 P.2d 1153, 1156 (1980) (finding a public prescriptive road easement based in part upon evidence of "grading, laying gravel and other maintenance of the road"); *Smith v. Russell*, 2003 MT 326, ¶¶ 14-17, 21, 318 Mont. 336, 80 P.3d 431 (finding that the public's use of a road coupled with Toole County's maintenance of the road established a public highway); *Hitshew v. Butte/Silver Bow Co.*, 1999 MT 26, ¶ 18, 293 Mont. 212, 974 P.2d 650 ("[T]he public's use coupled with

10

a county government's regular maintenance of a roadway without the landowner's permission is evidence of adverse use."); *Swandal Ranch Co. v. Hunt*, 276 Mont. 229, 235-36, 915 P.2d 840 (1996) (determining that evidence of regular county road maintenance supported the element of adversity in a claim to a public prescriptive road easement); *PLAA v. Jones*, 2004 MT 394, ¶ 33, 325 Mont. 236, 104 P.3d 496 (finding a public prescriptive road easement based upon evidence of public use, including recreational use, and Teton County's periodic maintenance of the road).

¶25 This approach is consistent with the general rule that the width of a public prescriptive roadway extends beyond the traveled portion of the road to include areas necessary for its support and maintenance. *See e.g., McKenzie Co. v. Reichman*, 812 N.W.2d 332, 344 (N.D. 2012) ("The width of a prescriptive road must be determined by actual use over the prescriptive period and may include shoulders and ditches needed to support and maintain the traveled portion of the road."); *Nikiel v. Buffalo*, 7 Misc. 2d 667, 670 (N.Y. Sup. 1957) ("[T]he width and extent of a highway established by prescription or use . . . is not necessarily limited to the beaten path or traveled tract. It carries with it . . . such width as is reasonably necessary for the safety and convenience of the traveling public and for ordinary repairs and improvements. A highway established by user includes the traveled tract and whatever land is necessarily used or is incidental thereto for highway purposes."); *Yturria Town & Improv. Co. v. Hidalgo Co.*, 125 S.W.2d 1092, 1094 (Tex. App. 1939) ("When a road is established by prescription, the right is not limited to the beaten path used, but may be made to include sufficient land for drainage ditches, repairs and the convenience of the traveling public."); *Keidel v. Rask*, 290 N.W.2d 255, 258 (N.D. 1980) ("The width of a

11

prescriptive public road established in the absence of a law specifying its width . . . necessarily includes not only the actual traveled surface area of the roadway, but also any adjacent land which is needed for the prescription to be maintained as a public road, including any land reasonably necessary for ditches, shoulders, and slopes."); *Teadtke v. Havranek*, 777 N.W.2d 810, 820 (Neb. 2010) ("If the public has acquired the right to a highway by prescription, it is not limited in width to the actual beaten path, but the right extends to such width as is reasonably necessary for public travel."); *Campbell v. Covington Co.*, 137 So. 111 (Miss. 1931) (In a highway established by prescription, "the public are not limited to the actual width used by them –the beaten path. The prescriptive right carries with it the beaten path and whatever is necessary to make the beaten path a usable highway . . . ."); *see also* Jon W. Bruce and James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 7:12, 7-29 (Thomson Reuters 2013) ("In the case  of a prescriptive roadway, particularly one acquired by the public, the width may extend beyond the paved or packed road surface to include areas used for cars to pass each other, for drainage ditches, and for shoulders.").

¶26　　We agree with these authorities and hold that the concept of a limited secondary easement does not apply to determine the width of a public road right-of-way established by prescriptive use. Here, the parties stipulated that there is a county road right-of-way established by prescriptive use at Seyler Lane and Seyler Bridge. The issue is thus not whether a public road right-of-way exists, but rather the width of that already existing right-of-way. Pursuant to the above discussion, we determine the Seyler Lane public right-of-way is not confined to the portion of the road actually traveled. Instead, its width extends

beyond the traveled way and includes whatever land is reasonably necessary to support and maintain the road and for the road to be safely and conveniently used.

**Width of Seyler Lane right-of-way**

¶27 The District Court did not establish a definite width for the County's secondary easement. Instead, it defined the easement by reference to "the lateral and subjacent support for Seyler Lane and Seyler Bridge" and to "such additional land as is reasonable and necessary for maintenance and repair." Because we reverse the District Court's conclusion that the County holds a separate secondary easement, we remand to determine the width of the single public road right-of-way. That determination must be made in accordance with the guidelines set forth in this opinion.

¶28 We begin with the well-recognized principle that the minimum 60-foot road width required by § 7-14-2112(1), MCA, does not apply to roads established by prescriptive use. *Wohl v. City of Missoula*, 2013 MT 46, ¶ 42, 369 Mont. 108, 300 P.3d 1119; *State v. Portmann*, 149 Mont. 91, 98, 423 P.2d 56, 56 (1967). Rather, the width of a roadway acquired by prescription is "determined as a question of fact by the character and extent of its use and may be more or less than the width of highways established by statute." *Portmann*, 149 Mont. at 95, 423 P.2d at 58 (citing *State ex rel. Game, Forestation and Parks Commn. v. Hull*, 97 N.W.2d 535 (Neb. 1959)) (also citing *Descheemaeker v. Anderson*, 131 Mont. 322, 326, 310 P.2d 587, 589 (1957) ("the public may obtain title by adverse possession of that only which it has occupied during the full statutory period.")). *See also Lovvorn v. Salisbury*, 701 P.2d 142, 144 (Colo. App. 1985) (width of public road established by prescriptive use is to be made by reference to the width established by the use). Therefore,

13

the District Court must consider, in addition to the land necessary to support and maintain the road, historical evidence of the nature of the enjoyment by which the public acquired the right-of-way.  Section 70-17-106, MCA.

¶29    A bridge is a part of the public road upon which it is built.  Section 60-1-103(22), MCA; *State ex rel. Furnish v. Mullendore*, 53 Mont. 109, 113-15, 161 P. 949, 951-52 (1916) ("a bridge is part and parcel of the highway upon which it is built. . . .  If the highways belong to the public, it must follow that anything permanently affixed to them, either in the way of repairs or in the form of completed structures, such as bridges and the like, become a part of them, and as much of public right as the highways themselves."); *State ex rel. Foster v. Ritch*, 49 Mont. 155, 156-57, 140 P. 731, 731 (1914) ("A bridge is to be treated as but a portion of a public highway.")  A bridge includes "all appurtenances, additions, alterations, improvements and replacements and the approaches to the bridge, lands used in connection with the bridge, and improvements incident or integral to the bridge."  Section 60-1-103(2), MCA.  This statute makes clear that Seyler Bridge, including its appurtenances, additions, alterations, improvements and replacements and the approaches to the bridge, lands used in connection with the bridge, and improvements incident or integral to the bridge, is part of the Seyler Lane county road right-of-way.  This public road right-of-way must be considered along with evidence of the public's use in determining width.

¶30    Like the Seyler Lane roadway, which requires areas beyond the traveled surface for its support and maintenance, Seyler Bridge's upkeep necessitates use of adjacent land.  Madison County maintains the subjacent and lateral support for Seyler Bridge.  Bridge inspectors Daniel Gravage and Shane Escott testified that access to the Ruby River for

14

purposes of performing essential bridge inspections requires use of neighboring land. Consistent with §§ 60-1-103(2) and 7-14-2107(3), MCA, the District Court should consider the land used for support and maintenance of the bridge in determining the width of the public's right-of-way. The width of a county road or bridge acquired by prescription must be sufficient to encompass the incidents necessary to enjoying, supporting and maintaining the roadway.

¶31 This analysis regarding the width of the right-of-way is consistent with the Encroachment Permit Madison County issued to Kennedy in 2004. The Encroachment Permit allowed Kennedy to construct and maintain "a fence on the county bridge right-of-way for the purpose of keeping livestock off the county road[.]" Kennedy installed the fences at Seyler Bridge pursuant to this permit. The right-of-way's boundaries are not defined by Kennedy's fences that narrow at the bridge; rather, the fences cut through the public road right-of-way.

¶32 In sum, we reverse the District Court's determination that the County holds a secondary easement that is independent of the public's right-of-way. We remand for the court to consider the evidence in the record, and conduct whatever additional proceedings it deems necessary, to establish a definite width of the single, unified, public road right-of-way at Seyler Lane.

¶33 *Issue Two: In determining the width of the public right-of-way at the intersection of Seyler Lane and the Ruby River, did the District Court err by excluding evidence of recreational use?*

¶34 PLAA argues that the District Court erred by excluding evidence of historical recreational use by the public in determining the width of the public road right-of-way at

15

Seyler Bridge. During the trial, the court determined there was no "basis to utilize recreational use for purposes of establishing a prescriptive right" and, accordingly, prohibited PLAA from presenting evidence of recreational use of the Seyler Lane right-of-way. Following trial, PLAA submitted an offer of proof regarding recreational use at Seyler Bridge. The court subsequently issued its Findings of Fact and Conclusions of Law, concluding that "[r]ecreational use is insufficient to establish a prescriptive easement."

¶35     This Court has held that " 'seasonal use by hunters, fisherman, hikers, campers, use by neighbors visiting neighbors, and persons cutting Christmas trees and gathering firewood are not sufficient to establish [prescriptive] use.' " *Leisz v. Avista Corp.*, 2007 MT 347, ¶ 37, 340 Mont. 294, 174 P.3d 481 (brackets in original) (quoting *McCauley v. Thompson-Nistler*, 2000 MT 215, ¶ 38, 301 Mont. 81, 10 P.3d 794). We have not, however, held that recreational use may never be considered. *See e.g. Brown & Brown of MT, Inc. v. Raty*, 2012 MT 264, ¶ 34, 367 Mont. 67, 289 P.3d 156 (concluding that "the undisputed evidence establishes that residential and recreational uses were within the scope of the prescriptive easement"); *Schmid v. Pastor*, 2009 MT 280, ¶ 21, 352 Mont. 178, 216 P.3d 192 (finding recreational use sufficient to give notice to the servient owner of an adverse claim to support a narrow prescriptive easement for recreational, but not residential, purposes); *PLAA v. Jones*, 2004 MT 394, ¶ 33, 325 Mont. 236, 104 P.3d 496 (considering recreational use among other factors establishing prescriptive use of road).

¶36     We conclude that the trial court's blanket exclusion of recreational use evidence was improper. Recreational use may be one factor in "the nature of the enjoyment" by which the public road right-of-way was acquired by prescriptive use and, thus, may be considered in

16

determining the width of the public road right-of-way. Further, in assessing the nature of such recreational use, we have recognized that implied acquiescence does not amount to permission, to defeat a showing of adverse use. *Brown & Brown of MT, Inc.*, ¶ 26. In *Lunceford v. Trenk*, 163 Mont. 504, 518 P.2d 266 (1974), we affirmed a judgment finding a prescriptive easement and declaring a public roadway, rejecting the argument that the use was permissive. We followed long-established law that, to prove the existence of a public road by prescription, "it must be shown that the public followed a definite course continuously and uninterruptedly for the prescribed statutory period together with an assumption of control adverse to the owner." *Lunceford*, 163 Mont. at 508, 518 P.2d at 268. We noted that "[the] testimony indicated that the use was not permissive, that no request for permission to use the road was asked nor given to a vast majority of the users. Plaintiffs assumed they had a right to use the road and used it." *Lunceford*, 163 Mont. at 509, 518 P.2d at 268. "Our case law has long recognized that '[c]ontinuous use' does not mean constant use; rather, if the claimant used the property in dispute whenever he desired, without interference by the owner of the servient estate, the use was continuous and uninterrupted." *Brown & Brown of MT Inc.*, ¶ 34 (citations omitted).

¶37 On remand, the plaintiffs are entitled to present evidence of recreational use to inform the District Court's determination of the width of the public right-of-way. As PLAA recognized during trial, that evidence will have to be confined to use pre-dating the 1985 statute that prohibits acquiring a prescriptive easement through "the entering or crossing of private property to reach surface waters." Section 23-2-322(2)(b), MCA.

17

¶38 Accordingly, we remand for the District Court to consider the evidence in the record, and conduct whatever additional proceedings it deems necessary, to establish a definite width of the public road right-of-way at Seyler Bridge. The District Court should consider the lands used in connection with the bridge (§ 60-1-103(2), MCA); "the incidents necessary to enjoying and maintaining it" (§ 7-14-2107(3), MCA); and historical evidence of the "nature of the enjoyment by which it was acquired" (§ 70-17-106, MCA), including evidence of recreational use. Any recreational uses by the public beyond the width necessary for the construction, maintenance and repair of the roadway and the bridge would have to be established through clear and convincing evidence for the requisite statutory period. *See Brown & Brown of MT, Inc.*, ¶ 19; *Portmann*, 149 Mont. at 95-96, 423 P.2d at 58.

¶39 *Issue Three: Is the use of a public road right-of-way established by prescription limited to historic use, or does it extend to all public uses, including recreation?*

¶40 The essential dispute here is whether the public can access the Ruby River from Seyler Lane for recreational purposes—specifically, whether the public can travel from Seyler Lane down to the high water mark of the river. The District Court determined it could not. The court's holding was based on its finding that PLAA failed to submit sufficient evidence of adverse public use to establish a prescriptive easement over the land between the fences that abut Seyler Bridge and the high water mark of the Ruby River; and on its conclusion that usage of a prescriptive road is limited to the original use during the prescriptive period.

¶41 The District Court did recognize a prescriptive right for the County to use any land needed for maintenance and repair, but determined that such land is not available for public

18

use. The court concluded that "County maintenance does not show usage by the public at large for purposes of public travel over areas utilized for maintenance of the road and bridge," and that "[t]here is a distinction between the right of the government to maintain the roadway bridge and the right of the public to travel everywhere maintenance activity is undertaken." Finally, the court determined that the "County prescriptive right to use maintenance areas cannot be transformed into a new traveled way."

¶42 We have reversed the District Court's conclusion that the areas needed for maintenance and repairs are not a part of the public right-of-way. We must now consider whether PLAA is required to show that particular areas within the public road right-of-way have been used adversely to access the Ruby River in order for the public to now use them as such. We determine it is not. Once a public road is established by prescriptive use, the use of that road is not limited to the adverse usage through which the road was acquired.

¶43 Section 70-17-106, MCA, provides that "[t]he extent of a servitude is determined by the terms of the grant or the nature of the enjoyment by which it was acquired." We have applied this statute in many cases involving *private* prescriptive easements and determined that it "limits owners of a prescriptive easement to the use that was established during the prescriptive period." *Kelly v. Wallace*, 1998 MT 307, ¶ 31, 292 Mont. 129, 972 P.2d 1117. However, in cases in which we have found that a *public* prescriptive road has been established, we have not held that the scope of use was limited to the historic use through which the road was acquired. *See e.g. Swandal Ranch Co.*, 276 Mont. 229, 915 P.2d 840; *Granite Co. v. Komberec*, 245 Mont. 252, 800 P.2d 166 (1990) (*overruled on other grounds by Warnack v. Coneen Family Trust*, 266 Mont. 203, 879 P.2d 715 (1994)); *Johnson v.*

19

*McMillan*, 238 Mont. 393, 778 P.2d 395 (1989) (*overruled on other grounds by Warnack*, 266 Mont. 203, 879 P.2d 715); *McClurg*, 188 Mont. 20, 610 P.2d 1153; *Hitshew v. Butte/Silver Bow Co.*, 1999 MT 26, 293 Mont. 212, 974 P.2d 650; *Clark v. Heirs & Devisees of Dwyer*, 2007 MT 237, 339 Mont. 197, 170 P.3d 927; *Jones*, 2004 MT 394, 325 Mont. 236, 104 P.3d 496.

¶44    The District Court's conclusion that use of a prescriptive road is limited to the original use during the prescriptive period relied upon a 2000 Attorney General Opinion (AG Opinion) and *State v. Portmann*, 149 Mont. 91, 423 P.2d 56 (1967).  The AG Opinion provides that "for county roads and bridges established by prescription, their use as access to waters is dependent upon their width and use during the prescriptive period," and cites to *Kelly* and *Portmann* for support.  48 Op. Att'y Gen. no. 13, § III(c) (2000).  Notably, *Kelly* involved a private easement, and *Portmann* is not on point.

¶45    In *Portmann*, we held that "the rights acquired by adverse use can never exceed the greatest use of the land for the full prescriptive period."  *Portmann*, 149 Mont. at 96, 423 P.2d at 58.  However, at issue in *Portmann* was not the scope of use of an easement, but rather the width of the easement.  The Court did not examine the scope of permitted uses within the prescriptive roadway.  *Portmann* thus does not stand for the proposition that the scope of use of a public prescriptive road is limited to historical adverse usage through which the road was acquired.  Rather, as discussed above, it supports our conclusion that public uses should be considered in determining the *width* of the public road right-of-way.

¶46    Our review of case law from other jurisdictions reveals that the scope of use for public prescriptive easements generally is not construed as strictly as the scope of use for private

20

prescriptive easements. "Numerous authorities hold that the scope of public prescriptive easements is broad enough to include reasonably foreseeable public uses." Bruce & Ely, *Law of Easements and Licenses in Land* § 8:12, 8-42.

¶47    In *Lovvorn*, 701 P.2d at 144, the Colorado Court of Appeals determined that a public prescriptive easement created through historical vehicular travel could also be used to trail cattle. The court reasoned:

> The ultimate distinction between a public road and a private easement, however acquired, is that the private easement can be, and is, limited to specific individuals and/or specific uses while a public road is open to all members of the public for *any* uses consistent with the dimensions, type of surface, and location of the roadway. There is no logical way to advise the members of the public as to which portions of the public roads they travel are subject to specific historic uses, much less to enforce the use of the roads for only those limited purposes. Thus, we conclude that once a road has been declared to be public, all uses that are permissible to the public under the laws of this state are permissible uses.

(Emphasis original). In *Boykin v. Carbon Co. Bd. Of Comm'rs*, 124 P.3d 677 (Wyo. 2005), the Wyoming Supreme Court adopted the same rule, and held that the restrictive use principle applicable between private parties did not apply to claims for the establishment of public highway right-of-ways. The court adopted the district court's reasoning:

> The use of a public highway right-of-way cannot be limited to historical uses as may be the case for private claimants of particular prescriptive easements. To rule otherwise would take us down a road we should fear to travel. . . . The use of the road may well increase in the future, and the method of such increased use cannot be foreseen. Such is the nature of a public highway right-of-way. To rule otherwise would defeat the very nature of a public road system.

*Boykin*, 124 P.3d at 686-87 (citing *Heath v. Parker*, 30 P.3d 746, 750 (Colo. 2001)).

21

¶48    Many other jurisdictions have similarly distinguished the scope of use of public prescriptive easements from that of private prescriptive easements. In *Bentel v. Co. of Bannock*, 656 P.2d 1383 (Idaho 1983), the Idaho Supreme Court found that the general rule that prescriptive easements are limited to the actual use which gave rise to the easement applies to private, not public, prescriptive easements. The Court recognized that "[i]n more contemporary decisions, other jurisdictions have held the scope of such [public prescriptive] easements comprehensive enough to include reasonably foreseeable public uses of such roadways . . . ." *Bentel*, 656 P.2d at 1386. The court held that a highway easement acquired by prescription was no less comprehensive than one acquired by grant, dedication or condemnation. *Bentel*, 656 P.2d at 1386. *See also Pickett v. Cal. Pac. Utils.*, 619 P.2d 325, 327 (Utah 1980) (adopting a rule that "the easement in a public highway, which the public acquires, includes every reasonable means for the transmission of intelligence, the conveyance of persons, and the transportation of commodities, which the advance of civilization may render suitable for a highway."); *Trigg v. Allemand*, 619 P.2d 573, 578 (N.M.App. 1980) ("Once a road is found to be open to the public and free and common to all citizens, they should be open for all uses reasonably foreseeable."); *Westlake v. Duncan, Dieckman & Duncan Min. Co.*, 307 S.W.2d 220, 222 (Ark. 1957) ("[I]n case of a private easement, as contrasted with a public highway, it is not permissible to impose a burden which is greater than the use which brought the private easement into existence. We do not find, however, that the same rule has been applied to a public highway acquired by prescription.").

22

¶49    In Montana, although we have not yet explicitly addressed the scope of use of public roads acquired by prescription, we have discussed our expansive interpretation of the uses of public highways in general. In *Kipp v. Davis-Daly Copper Co.*, 41 Mont. 509, 516, 518, 110 P. 237, 240 (1910), the Court recognized that highways may be used "in any manner or for any purpose which is reasonably incident[al] to the appropriation of them to public travel" and "for all uses to which [they] might reasonably be put in view of improved methods and the increasing needs of the public . . . ." We explained that "a highway is created for the use of the public, not only in view of its necessities and requirements as they exist, but also in view of the constantly changing modes and conditions of travel and transportation . . . ." *Kipp*, 41 Mont. at 517, 110 P. at 240.

¶50    In *Bolinger*, we observed the following regarding a public prescriptive easement:

> [T]he easement is not limited to the particular methods of use in vogue when the easement was acquired, but includes all new and improved methods, the utility and general convenience of which may afterwards be discovered and developed in aid of the general purpose for which highways are designed.
>
> .    .    .
>
> Where land is conveyed for a public highway the implication must be that it will be used as the convenience and welfare of the public may demand, although that demand may be augmented by the increase of population.
>
> .    .    .
>
> [T]he dedicator is presumed to have intended the property to be used in such a way by the public as will be most convenient and comfortable and according to not only the properties and usages known at the time of dedication, but also to those justified by lapse of time and change of conditions.

*Bolinger*, 158 Mont. at 514, 520-21, 493 P.2d at 1065-66, 1069 (quoting *Cater v. Northwestern Tel. Exch. Co.*, 63 N.W. 111, 112 (Minn. 1895); *Collop v. United R.R.s of San*

*Francisco*, 228 P. 59, 61 (Cal. App. 1924); *Wattson v. Eldridge*, 278 P. 236, 238 (Cal. 1929)).

¶51　　When a public roadway is acquired through prescriptive use instead of a grant or dedication, the same issue pertaining to usage arises:  Should public use of that easement be limited to the usage that existed at the time the easement was established, or, rather, should usage accommodate the passage of time and the public's ongoing needs?  Just as the Court has determined that the uses of a dedicated public highway change over time, so do the uses of a public roadway acquired by prescription.  Pursuant to the above discussion, we determine the scope of a public road right-of-way established by prescriptive use is not strictly limited to the adverse usage through which the easement was acquired, as it is in the case of private prescriptive easements.  The scope includes public uses that are reasonably incident to the uses through which the easement was acquired and uses that are reasonably foreseeable.  Hence, once a public prescriptive road is established, the fact that a certain public use was not adverse does not mean that the use is not permitted.

¶52　　In the case before us, the District Court determined that the public could not travel on the land between the fences at Seyler Bridge and the high water mark of the Ruby River. The use of the Seyler Lane right-of-way as access to the Ruby River is not dependent upon whether this use was established adversely during the prescriptive period.  Foot travel over a roadway is, and has always been, a foreseeable use of the road surface as well as any shoulders, embankments and abutments supporting the roadway.  Separate from the question of width, use of the road for access to the Ruby River is a reasonably foreseeable use of a public road right-of-way that crosses a river.

24

¶53    *Issue Four:  Did the District Court err by rejecting certificates of survey (COS) as evidence of the width of the existing public right-of-way at the intersection of Seyler Lane and the Ruby River?*

¶54    PLAA maintains that the District Court erred by disregarding the COS presented by PLAA at trial and incorrectly concluded such surveys, as a matter of law, could not establish the existence of a prescriptive easement.  The District Court did not determine that the certificates were inadmissible, nor did the court conclude that COS can never prove the existence of an easement.  Rather, the court found that the specific surveys PLAA presented did not provide information on the dimensions of the Seyler Lane right-of-way.

¶55    Because we are remanding for the District Court to determine the width of the public road right-of-way and instructing the court to conduct whatever additional fact-finding it deems appropriate, it is not necessary for us to further address this issue at this time.  This Opinion in no way precludes PLAA from presenting to the court on remand any COS that provide information regarding the dimensions of the right-of-way at issue.

¶56    *Issue Five:  Did the District Court effectuate an unconstitutional taking of Kennedy's property when it ruled that the public may access the Ruby River via the right-of-way granted by the Lewis Lane deed?*

¶57    Kennedy cross-appeals the District Court's grant of summary judgment to PLAA on the issue of public access at Lewis Lane.  In its 2008 order, the District Court determined that the public could use the 60-foot-wide right-of-way at Lewis Lane and Lewis Bridge to reach the Ruby River.  Kennedy maintains that the court erred for two reasons.  First, he argues that the Lewis Lane right-of-way was never intended to be used for access to the Ruby River for fishing, hunting, wading, and boating.  Second, Kennedy asserts that the District Court's conclusion that the public may access the Ruby River where Lewis Lane

25

crosses the Ruby River constitutes an unconstitutional taking of his property because he owns the riverbed underlying the public right-of-way.

¶58 We reject Kennedy's contentions. The District Court did not err, or effectuate a taking, when it ruled the public may access the Ruby River via the right-of-way the County purchased in the Lewis Lane deed. Kennedy's predecessor in interest expressly granted a public right-of-way without limiting its uses. Further, it is well-settled in Montana that the public may use the beds of non-navigable rivers for recreation without effectuating a taking.

¶59 We agree with the District Court that Kennedy's contention that the 60-foot-wide right-of-way his predecessor in interest granted cannot be used for river access must fail. Deeds granting a "right-of-way" have, in some cases, been construed as granting a fee interest in land.[2] Bruce & Ely, *Law of Easements and Licenses in Land* § 1:22, 1-57, n. 3. Express language in a deed granting a "right-of-way" may, alternately, be considered to create an express easement. Bruce & Ely, *Law of Easements and Licenses in Land* § 1:24, 1-60 to 1-62; *see Kenneally v. Clark*, 2011 U.S. Dist. LEXIS 122357, 9-10 (D. Mont. Sept. 21, 2011) (discussing rules about defining express easements). Generally, a public easement described in a deed will be upheld as long as the deed's language sufficiently locates the easement. *State by Mont. State Fish & Game Comm'n v. Cronin*, 179 Mont. 481, 486, 587 P.2d 395, 399 (1978). The language is construed in accordance with the clear intent of the parties. *Cronin*, 179 Mont. at 486, 587 P.2d at 399. In *Bolinger*, we explained:

---

[2] It should be noted that in Montana there is a rebuttable presumption that the owner of land bounded by a road or street takes title to the middle of the road, unless a different intent appears from the deed. *McPherson v. Monegan*, 120 Mont. 454, 458-59, 187 P.2d 542, 544 (1947).

26

Whether or not a particular use amounts to a diversion from that for which the dedication was made depends on the circumstances of the dedication and the intention of the party making it. It has been held that such use is authorized as is fairly within the terms of the dedication and reasonably serves to fit the property for enjoyment by the public in the manner contemplated. In other words, the dedicator is presumed to have intended the property to be used in such way by the public as will be most convenient and comfortable and according to not only the properties and usages known at the time of the dedication, but also to those justified by lapse of times and change of conditions.

*Bolinger*, 158 Mont. at 521, 493 P.2d at 1069 (quoting *Wattson*, 278 P. at 238).

¶60    Kennedy has failed to demonstrate that his predecessor did not intend to authorize access to the Ruby River from Lewis Lane for public fishing, wading, hunting or other uses. Assuming *arguendo* that the interest Kennedy's predecessor granted in the deed to Lewis Lane was not a fee interest, the deed still permits the uses Kennedy contests. The deed dedicated a 60-foot-wide right-of-way for Lewis Lane, including Lewis Bridge and the land and water underlying it, as a County road. The deed expressly stated that the land was to be used as a "public highway" and if it should be abandoned from that use, would revert to the grantor and his heirs and assigns. Thus, the deed's express terms dedicated the right-of-way for public use. It did not restrict the public from any use on that stretch of the road. Since this grant created a public right-of-way, we presume that Kennedy's predecessor intended to provide for not only those public uses known at the time, but those justified by lapse of time and change of conditions. These include convenient and comfortable public uses, including access to the Ruby River. We therefore agree with the District Court that the public may use this right-of-way to access and enter the river. We also agree with the District Court's

27

reasoning that "where a county road intersects state waters, the portion of each which is congruent with the other creates two over lapping public rights of way."

¶61　Kennedy's takings argument is unpersuasive because Kennedy has no compensable property interest in the property he claims has been taken from him. Kennedy contends that, as owner of the streambed underlying the non-navigable Ruby River, he has the right to control access to the waters above, including the right to exclude persons from wading into the river or floating on the water. He maintains that declaring a public easement between the high water marks of the Ruby River at Lewis Lane amounts to an unconstitutional taking of his private property without due process and just compensation. In making this claim, Kennedy argues our Stream Access Law is unconstitutional and challenges our decisions in *Mont. Coalition for Stream Access v. Curran*, 210 Mont. 38, 682 P.2d 163 (1984), and *Mont. Coalition for Stream Access v. Hildreth*, 211 Mont. 29, 684 P.2d 1088 (1984).

¶62　Kennedy's argument fails for two reasons. First, when Kennedy's predecessor in interest deeded Lewis Lane road to the County, he also granted the swath of riverbed underlying the bridge and within the right-of-way to the public. Kennedy's predecessor did not exclude the land underlying the bridge from the deed conveying the right-of-way. The public retains the right to use this bought-and-paid-for right-of-way. Kennedy has no right to complain that the public is using the right-of-way the County purchased from Kennedy's predecessor. Yet, even if Kennedy's predecessor had not expressly granted a right-of-way to the County for use by the public, it is settled law in Montana that the public may use the beds of non-navigable rivers, up to the high water mark, for recreation. *See* §§ 23-2-301 to 21-2-322, MCA; *Curran*, 210 Mont. at 53, 682 P.2d at 171; *Hildreth*, 211 Mont. at 35-36, 684

28

P.2d at 1091; *Galt v. State*, 225 Mont. 142, 148, 731 P.2d 912, 916 (1987). Our precedent makes manifestly clear that this public use does not constitute a compensable taking of private property: No title passes with the use right.

¶63 In Montana, waters within the state are State property held in trust for the people. Mont. Const. art. IX, § 3(3). Kennedy's reliance on *Ill. C. R. Co. v. Ill.*, 146 U.S. 387, 13 S. Ct. 110 (1892) (henceforth, "*Illinois Central*"), *U.S. v. Causby*, 328 U.S. 256, 66 S. Ct 1062 (1946) and *Kaiser Aetna v. U.S.*, 444 U.S. 164, 100 S. Ct. 383 (1979), to assert he may control use of the water overlying the section of riverbed he owns, is misplaced. We have already explained that our Constitution, statutes and precedent preclude a riparian landowner from excluding public use of a streambed.

¶64 Kennedy misconstrues *Illinois Central* to assert that his ownership of the streambed also gives him ownership of the water. The dicta from *Illinois Central*, to which Kennedy cites, operate to illustrate the difference between the State's "ownership" of submerged lands and the State's ownership of public lands it could sell. *Illinois Central*, 146 U.S. at 452, 13 S. Ct. at 118 ("[The State's] title [to the beds of Lake Michigan] necessarily carries with it control over the waters above them . . . . But it is a title different in character from that which the State holds in lands intended for sale."). The key distinction, the U.S. Supreme Court pointed out, was that the State's ownership of submerged lands "is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties." *Illinois Central*, 146 U.S. at 452, 13 S. Ct. at 118. The State could not grant title to submerged lands where "abdication is not consistent with the exercise

29

of that trust which requires the government of the State to preserve *such waters for the use of the public.*" *Illinois Central*, 146 U.S. at 452, 13 S. Ct. at 118 (emphasis added). Even upon transfer, the State's control for purposes of the trust can never be lost. *Illinois Central*, 146 U.S. at 453, 13 S. Ct. at 118. The U.S. Supreme Court stated:

> The State can no more abdicate its trust over property in which the whole people are interested, like navigable waters and soils under them, so as to leave them entirely under the use and control of private parties, except in the instance of parcels mentioned for the improvement of the navigation and use of the waters, or when parcels can be disposed of without impairment of the public interest in what remains, than it can abdicate its police powers in the administration of government and the preservation of the peace.

*Illinois Central*, 146 U.S. at 453, 13 S. Ct. at 118. In fact, *Illinois Central* illustrates the principle that the State must protect the public's opportunity to use and enjoy the waters it holds in trust for the people "freed from the obstruction or interference of private parties." *Illinois Central*, 146 U.S. at 452, 13 S. Ct. at 118.

¶65 In Montana, the public trust as to waters is enshrined in our laws and our Constitution. *See* Mont. Const. art. IX, 3(3); §§ 23-2-301 to 21-2-322, MCA. Article IX, § 3(3) of the Montana Constitution provides:

> All surface, underground, flood, and atmospheric waters within the boundaries of the state are the property of the state for the use of its people and are subject to appropriation for beneficial uses as provided by law.

The State does not only own navigable waters as a public trust; it also owns non-navigable waters. *Galt*, 225 Mont. at 147, 731 P.2d at 915; *see* Mont. Const. art. IX, § 3(3).

¶66 Our decisions in *Curran* and *Hildreth*, as codified, protect the public's right to recreationally use its non-navigable waters, free from interference by private landowners. In *Curran*, codified at § 23-2-302, MCA, we held that "any surface waters that are capable of

30

recreational use may be so used by the public without regard to streambed ownership or navigability for nonrecreational purposes." *Curran*, 210 Mont. at 53, 682 P.2d at 171. We reaffirmed *Curran*'s holding that any waters capable of recreational use could be so used in *Hildreth*. *Hildreth*, 211 Mont. at 35, 684 P.2d at 1091. There, we observed that, because the Montana Constitution provides the State owns the waters for the benefit of its people, and places no limit on their use, "this Court cannot limit their use by inventing some restrictive test." *Hildreth*, 211 Mont. at 35, 684 P.2d at 1091. The public has a broad use right to surface waters and private landowners may not place obstacles that impede the public's exercise of its right. *Curran*, 210 Mont. at 52-53, 682 P.2d at 170-71. This use right is not a property right, or an interest in the landowners' property. *See* § 23-2-309, MCA. Rather, it amounts to a recognition of the physical reality that in order for the public to recreationally use its water resource, some "minimal" contact with the banks and beds of rivers is generally necessary. *See Galt*, 225 Mont. at 147, 731 P.2d at 915.

¶67    Because the Montana Constitution grants the State ownership of all waters within its borders, Kennedy's reliance on *Causby*, 328 U.S. at 259, 66 S. Ct 1064-65, to assert he may control use of the Ruby River's waters is also misplaced. *Causby* involved use of airspace over a chicken farm that interfered with the farmers' business. *See Causby*, 328 U.S. at 259, 66 S. Ct. at 1064-65. To hold that a riparian owner "owns" the "space" overlying a riverbed, when that space is occupied by water, would be to divest the State of title to waters it owns by virtue of article IX, § 3(3), of the Montana Constitution.

¶68    Similarly, the State's constitutionally-granted public trust ownership of all waters in Montana distinguishes this case from *Kaiser Aetna*. That case concerned a "fishpond" on

31

private property in Hawaii, where owners had dredged a channel to connect the pond to the ocean. *Kaiser Aetna*, 444 U.S. at 166-68, 100 S. Ct. at 386-87. Significantly to the majority opinion, Hawaiian fishponds like the one at issue had always been considered private property in Hawaii. *Kaiser Aetna*, 444 U.S. at 166, 179, 100 S. Ct. at 386, 392-93. *Kaiser Aetna's* recognition that a fishpond could constitute private property hinged on State law. Here, Montana's Constitution grants the State ownership of waters within the state. Mont. Const. art. IX, § 3(3). Thus, *Kaiser Aetna*—and Hawaiian law—cannot support the proposition that a Montana riparian owner owns the water overlying the bed of a non-navigable river.

¶69    It is settled law in Montana that public recreational use of State-owned waters is not a taking because title to non-navigable riverbeds does not pass to the public. As we stated in *State ex rel. Perry v. District Court*, " '[d]ecisions construing the Constitution should be followed, in the absence of cogent reasons to the contrary . . . .' " 145 Mont. 287, 310, 400 P.2d 648, 660 (1965) (quoting *State ex. rel. Kain v. Fischl*, 94 Mont. 92, 20 P.2d 1057 (1933)). Some insignificant use of the riverbeds and river banks is, and always has been, necessary to the public's use and enjoyment of its resource. That use does not amount to an easement or any other "interest" in land. *See* § 23-2-309, MCA. In *Curran* we explained that since "the question of title to the bed is irrelevant to determination of navigability for use, and Curran has no claim to the waters," no taking of private property could occur. *Curran*, 210 Mont. at 53, 682 P.2d at 171. We also observed in *Hildreth*, where Hildreth brought a similar claim, that no taking of private property occurs in public use of beds and banks of waters up to the high water mark because title does not pass with the use right.

32

*Hildreth*, 211 Mont. at 36-37, 684 P.2d at 1092.  As observed by the United States District Court in *Madison v. Graham*, no private property right is "being extracted" from Kennedy: "In fact, the public has no interest at all in the private streambed *per se*, but only in the publicly-owned surface waters that traverse the streambed."  *Madison v. Graham*, 126 F. Supp. 2d 1320, 1324 (D. Mont. 2001).  We can see no reason to overturn these longstanding interpretations of our Constitution and our laws.

¶70    The terms of the deed granting the public right-of-way, along with the Montana Constitution, the public trust doctrine and this Court's decisions in *Curran*, *Hildreth* and *Galt*, foreclose Kennedy's argument.  Kennedy's predecessor in interest granted a right-of-way encompassing parts of the Ruby River's bed to the County, and the public may use that right-of-way to access the Ruby River.  Kennedy never owned a property right that allowed him to exclude the public from using its water resource, including the riverbed and banks up to the high water mark.  Nothing has been taken from him.  Kennedy has offered no convincing reason to disrupt what has long been settled constitutional law in Montana.

**CONCLUSION**

¶71    We conclude that the District Court erred by finding a secondary easement that is independent and separate from the public's easement.  The areas that are reasonably necessary to support and maintain Seyler Bridge, and to ensure the public's safe and convenient use of it, are included in the Seyler Lane public road right-of-way.  We therefore remand for the District Court to consider the evidence in the record and conduct whatever additional proceedings it deems necessary to establish a definite width of the public right-of-way, applying the principles stated in this Opinion.

33

¶72 We further determine that the scope of use of the public road right-of-way is not limited to the adverse usage through which it was acquired and that any foreseeable uses of a public road right-of-way, including recreational use, are permitted.

¶73 Finally, Kennedy's takings argument does not hold water: He presents no persuasive argument that a compensable property interest has been taken from him or that we should overturn our precedent and disrupt long-settled constitutional law.

¶74 Reversed and remanded for further proceedings consistent with this Opinion.

/S/ MICHAEL E WHEAT

We concur:

/S/ KURT KRUEGER
District Judge Kurt Krueger sitting for former Justice Brian Morris
/S/ MIKE MENAHAN
District Judge Mike Menahan sitting for Chief Justice Mike McGrath
/S/ PATRICIA COTTER
/S/ BETH BAKER

Justice Beth Baker, concurring.

¶75 The District Court made a finding of fact that "Seyler Bridge and its approaches on Seyler Lane is a county road right-of-way that was established by prescriptive use." No party appeals this finding, all having stipulated to it before the trial court.[1] We therefore begin with the undisputed fact that at issue is a public road. The primary issue on appeal is, having been acquired by prescriptive use, how wide is the public road where the bridge crosses the river? I agree with the Court's decision to remand this issue for further

---

[1] It bears noting that Madison County was a party to the stipulation.

34

development in the District Court. I also concur with the Court's disposition of Kennedy's cross-appeal. I write separately to address the principal misconception of law on which I believe the Dissent falters.

¶76 The Court correctly notes our long-standing requirement, grounded in § 70-17-106, MCA, that the width of a roadway acquired by prescription is determined "by the character and extent of its use[.]" Opinion, ¶ 28. In that regard, the law requires proof by clear and convincing evidence of "open, notorious, exclusive, adverse, continuous, and uninterrupted use over the five-year statutory period." *Brown & Brown of MT, Inc.*, ¶ 19. *See also Swandal Ranch Co.*, 276 Mont. at 233, 915 P.2d at 843. Thus, "the public may obtain title by adverse possession of that only which it has occupied during the full statutory period." *Portmann*, 149 Mont. at 95, 423 P.2d at 58. The Court also observes two additional statutes that inform the determination of the Seyler Bridge's width: § 7-14-2107(3), MCA (when county road established, public acquires right-of-way "and the incidents necessary to enjoying and maintaining it"), and § 60-1-103(2), MCA (bridge includes, among other things, "the approaches to the bridge [and] lands used in connection with the bridge").

¶77 With due respect, Justice McKinnon's Dissent is wrong in suggesting that the out-of-state authority cited by the Court does not support this holding. Dissent, ¶ 101. The cited case law uniformly makes clear that the width of a prescriptive public road "necessarily includes" *both* the "traveled surface area of the roadway" *and* the "adjacent land which is needed for the prescription to be maintained as a public road[.]" *Keidel*, 290 N.W.2d at 258. For similar reasons, her Dissent mischaracterizes the Court's decision as "expand[ing]" the public's right of way. Dissent, ¶ 106. The Court's conclusion is simply that the width of

Seyler Road at the Seyler Bridge "is determined by the terms of the grant or the nature of the enjoyment by which [the roadway] was acquired." Section 70-17-106, MCA. The language of the statutes—§§ 60-1-103(2) and 7-14-2107(3), MCA—incorporates the principles reflected in the case law that "the width of a prescriptive road must be determined by actual use over the prescriptive period and may include shoulders and ditches needed to support and maintain the traveled portion of the road." *Reichman*, 812 N.W.2d at 344. That the prescriptive right does not allow the public "'to lay out and construct an extended and enlarged highway'" (Dissent, ¶ 102 (quoting *Campbell*, 137 So. at 112)) is precisely why a definite width of the public road right-of-way must be determined.

¶78 Justice McKinnon's focus on the law of prescriptive easements begins with the proposition that a county road may not be acquired by prescriptive use, but must be formally accepted by the board of county commissioners. Dissent, ¶ 87. Her Dissent maintains that the laws regarding public highways should not inform the Court's rulings in this case because the statutes do not apply to prescriptive easements. Dissent, ¶ 95. I believe these characterizations of the law to be in error, an error that leads the Dissenting Justices astray in their ultimate conclusion that the law governing primary and secondary easements controls the analysis in this case.

¶79 We have recognized that "a public easement is not the equivalent of a county road. An easement is a nonpossessory interest in land." *Pedersen v. Dawson Co.*, 2000 MT 339, ¶ 23, 303 Mont. 158, 17 P.3d 393 (citing *Kuhlman v. Rivera*, 216 Mont. 353, 358, 701 P.2d

36

982, 985 (1985)). With one brief interval,[2] it has long been the law in Montana that a public road may be established by prescriptive use. *See State v. Nolan*, 58 Mont. 167, 172, 191 P. 150, 152 (1920). Section 2600 of the 1895 Political Code provided:

> All highways, roads, streets, alleys, courts, places, and bridges, laid out or erected by the public, or now traveled or used by the public, or if laid out or erected by others, dedicated or abandoned to the public, or made such by the partition of real property, are public highways.

 (later modified and renumbered as § 1612, R.C.M. (1921); § 32-103, R.C.M. (1947)). That section was repealed with the enactment of the Montana Highway Code in 1965 (1965 Mont. Laws, ch. 197). In its place, the new Highway Code defined "public highways," a definition that remains today:

> "Public highways" means all streets, roads, highways, bridges, and related structures:
> (a) built and maintained with appropriated funds of the United States or the state or any political subdivision of the state;
> (b) dedicated to public use;
> (c) acquired by eminent domain, . . .; or
> (d) acquired by adverse use by the public, with jurisdiction having been assumed by the state or any political subdivision of the state.[3]

Section 60-1-103(22), MCA. Although not all public highways are county roads, all county roads are public highways. *See* § 60-1-201(1), MCA (classification of public highways).

¶80 As the Court observes, we have held that a county road may be declared based upon prescriptive use. *E.g., Swandal Ranch Co.*, 276 Mont. at 233, 915 P.2d at 843. No party to

---

[2] Section 2603 of the Political Code of Montana, enacted in 1895, provided that use alone was insufficient to establish a public highway, "until so declared by the board of commissioners or by dedication by the owner of the land affected." The statute was amended in 1913 to delete the prohibition against creating a public highway by use alone. *See Richter v. Rose*, 1998 MT 165, ¶ 28, 289 Mont. 379, 962 P.2d 583.

[3] As the Court observes (Opinion, ¶ 9), and Madison County's briefing makes clear, the County has assumed jurisdiction of Seyler Bridge.

this case contests that point. "The law, doubtless, is that a highway may be established by prescription as well as by proceedings taken in conformity with legislative authority[.]" *State v. Auchard*, 22 Mont. 14, 15-16, 55 P. 361, 362 (1898). The Dissent's contrary suggestion notwithstanding (Dissent, ¶ 90), this Court in *Swandal Ranch Co.* expressly affirmed a district court judgment that "declared a Park County road" by prescriptive use. *Swandal Ranch Co.*, 276 Mont. at 232, 236, 915 P.2d at 842, 844. Distinct from an easement, there is a public possessory interest in a roadway acquired by adverse use. Justice McKinnon largely focuses on a matter that is not at issue in this case: *whether* Seyler Lane is a county road acquired by prescriptive use.

¶81　　Though not directly an issue here, the discussion is not academic and merits response. Because of Seyler Lane's nature as a public roadway, the Court concludes that principles of primary and secondary easements do not control the determination of its width at Seyler Bridge. Rather, the width must be determined based on evidence of the "lands used in connection with the bridge" (§ 60-1-103(2), MCA), "the incidents necessary to enjoying and maintaining it" (§ 7-14-2107(3), MCA), and historical evidence of the "nature of the enjoyment by which it was acquired" (§ 70-17-106, MCA). Opinion, ¶ 38. In contrast, the Dissenting Justices would hold that Madison County has a right to lands beyond the reach of the general public, but only for the singular purpose of maintenance of the road and bridge. Dissents, ¶¶ 106, 126. The distinction is important, and the Court's construction correct, because once the width of the public road is established, the county does not have infinite rights to chip away at the landowner's property boundary to meet its maintenance needs. As the Minnesota Supreme Court pointed out in *Barfnecht v. Town Bd. of Hollywood Township*,

232 N.W.2d 420, 424 (Minn. 1975), the government may accomplish its future needs for "upgrading, widening, or improving public ways" acquired by prescription through the process of eminent domain. The Colorado case cited by the Court includes a similar analysis. There, the court agreed that if the width of a public road established by prescriptive use "is to be expanded or the location changed, acquisition of additional land must be established by eminent domain or otherwise." *Lovvorn*, 701 P.2d at 144. Finally, in my view, the analysis suggested by Justice Rice will apply to roads and bridges subject to a public prescriptive easement, but not to cases such as this one, where there is no dispute that the right of way at issue is a public road.

¶82 By recognizing the legal effect of the District Court's finding that Seyler Lane is a county road right-of-way that was established by prescriptive use, the Court avoids confusion between possessory and non-possessory interests and protects landowners from future encroachments outside the boundaries of the public right-of-way under the auspices of a secondary easement, once width is established. How those principles affect the ultimate outcome in this case, and whether the public has a right to access the Ruby River from Seyler Bridge, are not decided today but must await the development of further evidence in the District Court.[4]

/S/ BETH BAKER

---

[4] I do not address Justice McKinnon's separate discussion of Kennedy's cross-appeal, except to note that its criticism of the Court based on *Richter* (Dissent, ¶ 114 n. 10) appears misplaced. At issue in *Richter* was an alleged common law dedication of a public right-of-way, whereas this case involves an express dedication by Kennedy's predecessor.

Justice Laurie McKinnon, dissenting in part and specially concurring in part.

¶83 I dissent from the Court's decision as to Issues One through Three, regarding Seyler Lane and Seyler Bridge. In my view, the Court's Opinion disregards more than a century of precedent governing prescriptive easements and undermines the balance the Legislature has struck between landowners and recreationists. As to Issue Five, I agree with the ultimate result the Court reaches regarding Lewis Lane and Lewis Bridge, but I do not agree with the Court's reasoning. I thus specially concur as to that issue.[1]

## I. Width and Use of Public Right-of-Way at Seyler Lane and Seyler Bridge

¶84 At the outset, I believe the parties' formulation of certain stipulated "facts" has hindered our ability to render a legally sound decision in this case. The Pretrial Order, which was signed by the trial judge and counsel for each party, lists numerous facts that "are admitted, agreed to be true, and require no proof." The confusion arises from the parties' stipulation that "Seyler Bridge and its approaches on Seyler Lane is a county road right-of-way that was established by prescriptive use." Elsewhere in the Agreed Facts, the parties appear to have stipulated that Seyler Lane is a "public highway," as defined by § 60-1-103(22)(d), MCA—meaning that Seyler Lane was "acquired by adverse use by the

---

[1] As to Issue Four, the Court is remanding this case for further proceedings on the width of the Seyler Lane right-of-way. As the Court acknowledges, the District Court "found that the specific surveys PLAA presented did not provide information on the dimensions of the Seyler Lane right-of-way." Opinion, ¶ 54. The Court then states, however, that PLAA is not precluded "from presenting to the [District Court] on remand any COS that provide information regarding the dimensions of the right-of-way." Opinion, ¶ 55. To the extent the Court is implying here that PLAA's surveys may somehow be relevant, I believe the District Court has considered this issue already and that the District Court's evidentiary determinations were appropriate. PLAA has not shown that the District Court abused its discretion when deciding the evidentiary value of the surveys, and I thus would affirm the District Court's rulings under Issue Four.

40

public, with jurisdiction having been assumed by [Madison County]." The question arises, therefore, as to the significance of the parties' separate characterization of Seyler Lane as "a county road right-of-way that was established by prescriptive use." For the reasons which follow, I believe this characterization is inaccurate and that the Court errs by incorporating it into the analysis of Seyler Lane's width.[2]

## A. "County Roads" are not Established by Prescriptive Use

¶85 "Public highways" are classified as (a) federal-aid highways, (b) state highways, (c) county roads, and (d) city streets. Section 60-1-201(1), MCA. A "county road," in turn, is defined as "any public highway opened, established, constructed, maintained, abandoned, or discontinued *by a county in accordance with Title 7, chapter 14*." Section 60-1-103(7), MCA (emphasis added); *see also* § 60-1-201(3), MCA. This specific definition of "county road" controls over the general definition of "public highways." *Brookins v. Mote*, 2012 MT 283, ¶ 28, 367 Mont. 193, 292 P.3d 347 (a specific statute controls over a general provision to the extent of any inconsistency); *accord* § 1-2-102, MCA.

¶86 A "public highway" may be acquired by adverse (i.e., prescriptive) use by the public. Section 60-1-103(22)(d), MCA. The statutorily prescribed methods for acquiring a "county road," in contrast, do not include "by prescriptive use." Pursuant to Title 7, chapter 14,

---

[2] Contrary to statements by the Court (Opinion, ¶ 18) and the Concurrence (Concurrence, ¶ 75), the District Court did not make a "finding," based on evidence, that Seyler Lane is a county road. Because the stipulated facts were "admitted, agreed to be true, and *require no proof*" (emphasis added), those facts were not issues at trial. Indeed, following a review of the trial transcript, it is clear that the parties were focused on other issues in the case. Correspondingly, in their respective Proposed Findings of Fact submitted post-trial, PLAA and Kennedy each distinguished between the "agreed facts" (the ones to which they had stipulated pretrial, as set forth in the Pretrial Order) and the "determined facts" (the ones found "based upon the evidence presented at trial"). The "county road" designation was a stipulated fact, not one "found" by the District Court as the Court and the Concurrence mistakenly identify.

41

MCA, a "county road" may be established in any of the following ways (which are set forth in § 7-14-2101(2)(b) and (3), MCA):

1. petition by freeholders, approval by resolution, and opening by the board of county commissioners (*see generally* Title 7, chapter 14, part 26, MCA);

2. dedication for public use in the county and approval by resolution of the board of county commissioners;

3. acquisition by eminent domain pursuant to Title 70, chapter 30, MCA, and acceptance by resolution as a county road by the board of county commissioners;

4. an exchange with the State as provided in § 60-4-201, MCA;

5. recognition of a legal route by a district court pursuant to § 7-14-2622, MCA;

6. acceptance by resolution of the board of county commissioners, following a public hearing, of a road that has not previously been considered a county road but that has been laid out, constructed, and maintained with state or county funds; or

7. acceptance and approval by resolution of the board of county commissioners of a road that is abandoned by the State.

¶87 While a *public highway* may be acquired through prescriptive use by the public, a public highway is not a *county road* until the board of county commissioners formally approves it as a county road pursuant to the methods outlined above.[3] There is no evidence, and nothing stated in the parties' Agreed Facts, that the Madison County Board of Commissioners approved Seyler Lane as a county road. Simply calling something a "county road" in the course of litigation—as the parties appear to have done here—does not make it one. "Implicit in all of Title 7, Chapter 14 as well as our prior decisions is that county roads

---

[3] The one exception to this statement is recognition of a legal route by a district court pursuant to § 7-14-2622, MCA. Although the board of county commissioners must be notified in advance, the proceeding may be commenced in the district court by any "directly affected person." Section 7-14-2622(1), MCA. Nevertheless, this sort of proceeding does not apply to "prescriptive easements." Section 7-14-2622(5), MCA.

cannot be created without the county's intent, *expressed through its board of commissioners, to do so.*"  *Pedersen v. Dawson Co.*, 2000 MT 339, ¶ 20, 303 Mont. 158, 17 P.3d 393 (emphasis added); *see also Garrison v. Lincoln Co.*, 2003 MT 227, ¶ 16, 317 Mont. 190, 77 P.3d 163 (emphasizing that our caselaw "does not pave the way for modern day citizens to disregard currently applicable statutes governing the creation of public roads").

¶88    For this reason, the fact that Madison County's attorneys signed the Pretrial Order stipulating that Seyler Lane is a "county road," Concurrence, ¶ 75 n. 1, is not sufficient to establish that Seyler Lane is, as a matter of law and fact, a county road.  A county's intent to establish a county road must be expressed *through its board of commissioners*.  *Pedersen*, ¶ 20.  Likewise, the fact that Madison County "has assumed jurisdiction of Seyler Bridge," Concurrence, ¶ 79 n. 3, does not transform Seyler Lane into a county road.  In fact, Madison County asserted in the District Court that its right to maintain Seyler Lane and Seyler Bridge arose from a prescriptive easement separate from the general public's prescriptive easement to travel on the roadway.  In its post-trial Proposed Conclusions of Law, Madison County proposed that "*Madison County and the public* have gained a prescriptive easement to travel on the paved portion of Seyler Lane," but that "*Madison County* has gained a prescriptive easement to repair, replace and maintain the paved portion of Seyler Lane" and that "*Madison County* has also gained a prescriptive easement to maintain areas beyond the travelled surface and adjacent subsurface" (emphases added).  These separate prescriptive easements for maintenance would have been unnecessary if the County believed—as the Court and the Concurrence mistakenly suggest—that Seyler Lane is a county road governed by county road statutes.  *See* § 7-14-2107, MCA (when the county commissioners acquire

43

property for county roads, the public gains "the right-of-way *and the incidents necessary to enjoying and maintaining it*" (emphasis added)). Significantly, Madison County did not cite this statute in its Proposed Conclusions of Law as authority to maintain Seyler Lane.

¶89 A reference to "county road" requires application of statutory provisions, while a reference to "prescription" invokes a century of common law jurisprudence governing the creation, width, and scope of prescriptive easements. The parties' reference to "a county road right-of-way," while simultaneously stating that it was "established by prescriptive use," is legally inconsistent and thus hinders our ability to provide a sound decision. The Court's failure to properly address this distinction will not only provide confusing precedent, but will ultimately prove difficult for the District Court to apply on remand.[4]

¶90 The Concurrence asserts "we have held that a county road may be declared based upon prescriptive use," citing *Swandal Ranch Co. v. Hunt*, 276 Mont. 229, 233, 915 P.2d 840, 843 (1996), in support of this assertion. Concurrence, ¶ 80. In *Swandal Ranch*, we specifically noted that we were not considering the creation of a county road through statutory procedures, but were instead addressing Park County's claim that it "had

---

[4] I note that the term "county roads established by prescriptive use" appears in two statutes enacted in 2009. *See* §§ 7-14-2622(5), 23-2-312(3), MCA. The origin of this terminology—which is inconsistent with the provisions just discussed—is not clear. It may have derived from a 2000 opinion of the Montana Attorney General, upon which House Bill 190 (2009) was based. *See* Laws of Montana, 2009, ch. 201, preamble; Mont. Atty. Gen. Op. 48-13, 2000 Mont. AG LEXIS 6 (May 26, 2000) (providing an opinion on access to Ruby River at three bridge crossings, including Seyler Bridge, and referring to "county roads and bridges created by prescription"). The terminology also could have derived from the District Court's September 30, 2008 order in the present litigation, which refers to the roads at issue, including Seyler Lane, as "county roads." (PLAA states in its opening brief on appeal that the District Court's 2008 order was "essentially codified" in §§ 7-14-2134(4), 23-2-312, and 23-2-313, MCA.) Regardless of its origin, however, "county road" means a public highway established by a county in accordance with statutory formalities. *Pedersen*, ¶ 20; §§ 7-14-2101, 60-1-103(7), 60-1-201(3), MCA.

44

established a *public easement* through prescriptive use" over Wallrock Road. 276 Mont. at 231, 234, 915 P.2d at 842, 843 (emphasis added). As the Concurrence recognizes, " 'a public easement is not the equivalent of a county road.' " Concurrence, ¶ 79 (quoting *Pedersen*, ¶ 23). Although we referred to Wallrock Road at times as a "county road," we did so primarily in the context of acknowledging that the Park County Commissioners' attempt to declare a county road in October 1950 had been "legally inadequate [under] . . . the statutory process." *Swandal Ranch*, 276 Mont. at 233-34, 915 P.2d at 843. The specific issue addressed in our opinion was "whether use of the road was permissive or adverse." *See Swandal Ranch*, 276 Mont. at 232-36, 915 P.2d at 843-45. Contrary to the Concurrence's suggestion, there is no indication that we considered whether prescriptive use could establish a "county road," as distinguished from a "public easement," under the statutes governing the creation of county roads. Moreover, such a holding would have been inconsistent with the fact that "county roads cannot be created without the county's intent, expressed through its board of commissioners, to do so." *Pedersen*, ¶¶ 20-23.

### B. "County Road" Statutes are Inapplicable

¶91 In spite of the parties' imprecision in referring to Seyler Lane as "a county road right-of-way that was established by prescriptive use," the Court and the Concurrence nevertheless treat Seyler Lane as though it is a county road whose width is determined by certain statutes. Citing §§ 7-14-2107(3) and 60-1-103(2), MCA, the Court observes that "[t]he width of a county road or bridge acquired by prescription must be sufficient to encompass the incidents necessary to enjoying, supporting and maintaining the roadway." Opinion, ¶ 30; *see also* Opinion, ¶¶ 24, 29, 38. The Concurrence also contends that these two statutes "inform the

45

determination of the Seyler Bridge's width." Concurrence, ¶ 76. I believe this approach is mistaken for three reasons.

¶92    As an initial matter, there is no indication in the record that the parties believed the *width* of the public right-of-way over Seyler Lane and Seyler Bridge should be determined by the Title 7 and Title 60 statutes on which the Court and the Concurrence rely. That approach is of the Court's and the Concurrence's own devising. As far back as the July 2008 hearing on the cross-motions for summary judgment, and in more recent District Court filings such as the Pretrial Order, the parties referred to Seyler Lane indiscriminately as a "public highway by prescription," a "public prescriptive road," a "public prescriptive right-of-way," and a "county road."[5] The parties did not attribute the same meaning to the term "county road" as the Court and the Concurrence have. Instead, PLAA and Kennedy correctly recognized that the right-of-way's *width* is governed by common law principles (which I discuss in the next section below).

¶93    Second, the Court and the Concurrence fail to cite any statutory basis for applying Title 7 and Title 60 statutes to determine the width of a public road established by prescription. Significantly, § 70-17-106, MCA, contradicts this approach. It states that "[t]he extent of a servitude is determined by [1] the terms of the grant or [2] the nature of the enjoyment by which it was acquired." Section 70-17-106, MCA. "[T]he terms of the grant" applies in the case of an express easement, while "the nature of the enjoyment by which it

---

[5] It should be noted that "highway" and "road" are not the same as "county road." "Highway" and "road" are "general terms denoting a public way for purposes of vehicular travel and include the entire area within the right-of-way." Section 60-1-103(19), MCA. "County road" means "any public highway opened, established, constructed, maintained, abandoned, or discontinued by a county in accordance with Title 7, chapter 14." Section 60-1-103(7), MCA.

46

was acquired" applies in the case of a prescriptive easement. Nothing in this statute indicates that the width of a prescriptive public road is determined by Title 7 or Title 60 statutes. Rather, consistent with common law principles, § 70-17-106, MCA, recognizes that prescriptive easements are determined by *use*.

¶94 Third, the Court's approach is also contrary to precedent. In *State v. Portmann*, 149 Mont. 91, 423 P.2d 56 (1967), we specifically addressed whether a statute providing that "[t]he width of all public highways . . . must be sixty feet" (now codified, as amended, at § 7-14-2112(1), MCA) applied to extend the width of a public road acquired by prescription. We held that applying this statute to determine the width of such a road would be "inconsistent with the general rule that the user determines the nature and the extent of the easement or title acquired." *Portmann*, 149 Mont. at 94, 423 P.2d at 58. We reaffirmed that, to "give the fullest recognition to the traditional requirements of adverse possession," the public "may obtain title by adverse possession of that only which it has occupied during the full statutory period." *Portmann*, 149 Mont. at 95-96, 423 P.2d at 58 (internal quotation marks omitted). We concluded that the 60-foot-width statute "was intended by the Legislature to apply only to public roads which were laid out by the official act of the proper public officials and was never intended to apply to prescriptive easements." *Portmann*, 149 Mont. at 96, 423 P.2d at 58. We further held that "the rights acquired by adverse use can never exceed the greatest use made of the land for the full prescriptive period." *Portmann*, 149 Mont. at 96, 423 P.2d at 58. In so doing, we acknowledged authority from other jurisdictions—namely, *State ex rel. Game, Forestation and Parks Commission v. Hull*, 97 N.W.2d 535 (Neb. 1959) (the width of a highway acquired by prescription is determined as a

47

question of fact by the character and extent of its use and may be more or less than the width of highways established by statute), and *Mulch v. Nagle*, 197 P. 421 (Cal. App. 1st Dist. 1921) (a road established through public use does not fall within the statutory minimum for public roads; the minimum width applies only to roads formally laid out by the proper public authorities).

¶95 Like the Title 7 statute addressed in *Portmann*, the two statutes invoked by the Court here were "never intended to apply to prescriptive easements." 149 Mont. at 96, 423 P.2d at 58. Section 60-1-103(2), MCA, concerns "bridge[s] constructed by the department [of transportation]"; it says nothing about prescription. Section 7-14-2107(3), MCA, states that "[b]y taking or accepting interests in real property for county roads, the public acquires only the right-of-way and the incidents necessary to enjoying and maintaining it." This provision, however, is part of a statute that concerns county roads established through the "petition" process. *See* § 7-14-2107(1), (2), MCA. The statute says nothing about what the public acquires through prescriptive use.

¶96 The Concurrence nevertheless posits that these statutes incorporate the principles reflected in caselaw. Concurrence, ¶ 77. While the statutes may appear to be consistent with common law principles, however, the Court and the Concurrence have construed them as authority for expanding the width of a prescriptive right-of-way, in violation of the longstanding rules that "the user determines the nature and the extent of the easement or title acquired" and "the public may obtain title by adverse possession of that only which it has occupied during the full statutory period." *Portmann*, 149 Mont. at 94-95, 423 P.2d at 58 (internal quotation marks omitted). Section 7-14-2107(3), MCA, clearly is intended to *limit*

48

the interest that the public acquires when a county condemns or contracts for a right-of-way to "only" the right-of-way and the incidents necessary to enjoying and maintaining it. The Court and the Concurrence twist this provision's meaning by suggesting, first, that it applies to public highways created by prescription and, second, that it *expands* the width of a prescriptive public right-of-way.

¶97 I am aware of no precedent in this Court's history—and neither the Court nor the Concurrence cites any—for using §§ 7-14-2107(3) and 60-1-103(2), MCA, to determine the width of a public road established by prescription. These statutes were not intended for that purpose, and the Court's approach here is contrary to well-established precedents which hold that the width of a prescriptive public road is determined by actual "use" and "occupation." *Maynard v. Bara*, 96 Mont. 302, 307, 30 P.2d 93, 95 (1934); *Portmann*, 149 Mont. at 95-96, 423 P.2d at 58. I would apply this law, and the common law rules discussed below, in determining the width of the Seyler Lane right-of-way.

### C. Common Law Principles Dictating the Right-of-Way's Width

¶98 A party seeking to establish a prescriptive public easement must show (by clear and convincing evidence) open, notorious, adverse, continuous, and uninterrupted use of the claimed easement for the full statutory period.[6] *Graham v. Mack*, 216 Mont. 165, 172-73, 699 P.2d 590, 595 (1984); *Wareing v. Schreckendgust*, 280 Mont. 196, 204-06, 930 P.2d 37, 42-43 (1996); *Heller v. Gremaux*, 2002 MT 199, ¶ 12, 311 Mont. 178, 53 P.3d 1259. Additionally, the party must show that the public pursued a definite fixed course, without

---

[6] The statutory period was five years prior to 1893, ten years from 1893 to 1953, and five years since 1953. *Yellowstone River, LLC v. Meriwether Land Fund I, LLC*, 2011 MT 263, ¶ 23 n. 9, 362 Mont. 273, 264 P.3d 1065.

any deviation, for the full statutory period.[7] *Pope v. Alexander*, 36 Mont. 82, 89, 92 P. 203, 205 (1907); *Peasley v. Trosper*, 103 Mont. 401, 405-06, 64 P.2d 109, 110-11 (1936); *Brannon v. Lewis & Clark Co.*, 143 Mont. 200, 203-04, 387 P.2d 706, 708-09 (1963); *Swandal Ranch*, 276 Mont. at 233, 915 P.2d at 843.

¶99    Here, the parties have stipulated that the foregoing elements have been met and that "the public has the right to use the paved portion of Seyler Bridge and its approaches on Seyler Lane for travel across Seyler Bridge over the Ruby River." The question is what rights, if any, the public has outside the paved portion of Seyler Lane. In this regard, the parties argue fundamentally different theories as to the legal significance of the stipulated facts. In Kennedy's view, the right-of-way to which the parties stipulated does not give the public any rights outside the paved portion of Seyler Lane. As such, Kennedy contends that PLAA must establish a separate prescriptive "footpath" leading from the pavement down to Ruby River; in other words, PLAA must prove, by clear and convincing evidence, that the public followed a definite, fixed course between the pavement and the water openly, notoriously, adversely, continuously, and uninterruptedly for the full prescriptive period. In PLAA's view, however, the right-of-way to which the parties stipulated includes not only the paved portion of Seyler Lane, but also "sufficient land" alongside the pavement for ditches,

---

[7] I agree with PLAA that the District Court was incorrect in stating that "[r]ecreational use is insufficient to establish a prescriptive easement." In *Public Lands Access Assn. v. Boone and Crockett Club Foundation, Inc.*, 259 Mont. 279, 856 P.2d 525 (1993)—the primary authority cited by the District Court on this issue—we did not hold that public use is insufficient if it is recreational; rather, we held that public use is insufficient if it is occasional. 259 Mont. at 285, 856 P.2d at 528-29. There is no reason why traveling a definite, fixed course over private land in an open, notorious, adverse, continuous, and uninterrupted manner for the full statutory period should not ripen into a prescriptive right-of-way merely because the people who do so are recreationists. Nevertheless, for reasons discussed below, I believe the District Court ultimately reached the correct result.

repairs, and other public uses—such as "accessing the Ruby River." PLAA states that it "is not seeking to acquire a new prescriptive easement beyond the existing Seyler Lane right-of-way." Rather, PLAA believes the stipulated right-of-way is wide enough to enable the public to reach the river.

¶100 In my view, PLAA's theory—and this Court's tacit adoption of it—is contrary to over a century of precedent governing prescriptive easements. Where the public claims a right-of-way founded on prescriptive use, this Court has been unequivocal that "[t]he occupancy or use by the public of one portion of the road does not avail it in its claim to another portion not occupied by it. . . . [T]he public may obtain title by adverse possession of that only which it has occupied during the full statutory period." *Maynard*, 96 Mont. at 307, 30 P.2d at 95; *accord State v. Auchard*, 22 Mont. 14, 16, 55 P. 361, 362 (1898) (the right is "confined to the very way claimed and traveled during the period").

¶101 Various out-of-state cases recognize that while the dimensions of a prescriptive public road are determined by the public's actual use of the land in question as a roadway during the prescriptive period, the right-of-way necessarily includes an incidental right to use adjacent land to the extent reasonably necessary to support and maintain the traveled surface area, such as shoulders, slopes, and ditches. *Semmerling v. Hajek*, 630 N.E.2d 496, 501 (Ill. App. 2d Dist. 1994); *Platt v. Ingham Co. Road Commn.*, 198 N.W.2d 893, 894 (Mich. App. 1972); *Barfnecht v. Town Bd. of Hollywood Township*, 232 N.W.2d 420, 423 (Minn. 1975); *Campbell v. Covington Co.*, 137 So. 111, 112 (Miss. 1931); *Teadtke v. Havranek*, 777 N.W.2d 810, 820 (Neb. 2010); *Nikiel v. City of Buffalo*, 165 N.Y.S.2d 592, 597 (N.Y. Sup. Ct. 1957); *Keidel v. Rask*, 290 N.W.2d 255, 258 (N.D. 1980); *McKenzie Co. v. Reichman*,

51

2012 ND 20, ¶¶ 31-33, 812 N.W.2d 332; *Yturria Town & Improvement Co. v. Hidalgo Co.*, 125 S.W.2d 1092, 1094 (Tex. App.—San Antonio 1939). However, contrary to the Court's discussion (Opinion, ¶ 25), these cases do not hold that the maintenance and support area may also be used for public travel.

¶102   In fact, the *Semmerling* court rejected such an argument:

> Here, there is . . . no evidence that the public used the grassy areas on either side of the road for road purposes. To the contrary, the evidence established that public use was limited to the paved portion of the road. The trial court certainly was not required to conclude in the absence of any other evidence that, just because the Township mowed those areas, the prescriptive easement encompassed those areas.

630 N.E.2d at 501; *accord Campbell*, 137 So. at 112 ("The prescriptive right carries with it the beaten path and whatever is necessary to make the beaten path a usable highway, but this does not mean that the prescriptive right carries with it the right in the public to lay out and construct an extended and enlarged highway . . . ."). By the same reasoning, the fact that Madison County maintains the areas alongside the paved portion of Seyler Lane does not mean that the public's right of travel extends to those areas.

¶103   In *Barfnecht*, the court considered a statute which provided for the acquisition of highways by adverse public use. It stated that any road used and kept in repair for at least six years as a public highway is deemed dedicated to the public to the width of two rods (33 feet) on each side of the center line thereof. *Barfnecht*, 232 N.W.2d at 422. The plaintiffs argued that recognizing a prescriptive right-of-way greater in width than the area actually used by the public during the period of prescription would amount to an unconstitutional

taking of private property. The court, however, construed the statute so as to avoid this result. The court observed that a prescriptive public easement

> arises from the fact that [adverse public] use serves to give the owner notice that, if he means to dispute the rightfulness of the public use, he must assert his right within a statutory period by physical action or suit. The statute provides a statute of limitations, the running of which estops an owner from denying the existence of a public easement. Public use cannot be said to apply to lands not actually used. There is no reason that an owner should know that he is required to dispute the rightfulness of a nonexistent user. A property owner thus receives no notice as to a public claim on any property in excess of that which has actually been used.

*Barfnecht*, 232 N.W.2d at 423 (footnote and paragraph break omitted). The court held, therefore, that "[p]rivately owned land cannot become public road by adverse use beyond the portion so used merely by a statutory pronouncement to that effect." *Barfnecht*, 232 N.W.2d at 423. Likewise, here, Title 7 and Title 60 statutes cannot be used to expand the Seyler Lane right-of-way beyond the width to which the parties stipulated—"the paved portion" of the road—without implicating an unconstitutional taking of private property.

¶104 As for the other out-of-state cases, *Teadtke* and *Yturria* did not involve issues of maintenance and support in relation to an easement's width. *Nikiel* was based on a New York statute which provided that the width of prescriptive public highways is at least three rods (49.5 feet). 165 N.Y.S.2d at 596-97. This is contrary to Montana law, which states that the width of prescriptive public roads is limited to the area actually occupied and used during the statutory period. *Portmann*, 149 Mont. at 95-96, 423 P.2d at 58. The *Platt* decision is consistent with this principle; the court there held that "though the width of a prescriptive easement in a public highway includes shoulders and ditches needed *and actually used*, it does not include the allowance of a width for shoulders and ditches *not used* but needed"—

53

the point being that the easement's width is determined by actual *use*. 198 N.W.2d at 894 (emphases added). Lastly, *Keidel* distinguished the "actual traveled surface area of the roadway" from the "adjacent land which is needed for the prescription to be maintained as a public road." 290 N.W.2d at 258; *accord McKenzie*, ¶ 31. Neither *Keidel* nor *McKenzie* held that the adjacent land may be used as an expanded travel area.

¶105 My disagreement with the Court, therefore, is with the notion that the adjacent land needed to support and maintain a prescriptive public road may be used by the public for other purposes, such as traversing down to a stream. Admittedly, the Court's Opinion is inconsistent in this regard. On one hand, we are told that "[r]ecreational use . . . may be considered in determining the width of the public road right-of-way." Opinion, ¶ 36. The Court thus implicitly allows recreational use to determine the width of a right-of-way beyond that necessary for maintenance. On the other hand, however, we are told that "[a]ny recreational uses by the public beyond the width necessary for the construction, maintenance and repair of the roadway and the bridge would have to be established through clear and convincing evidence for the requisite statutory period." Opinion, ¶ 38. Contrary to the language in ¶ 36, the language in ¶ 38 indicates that any recreational use beyond the width necessary for maintenance will have to be proved as a separate prescriptive easement. How the parties and the District Court are to analyze recreational use on remand is, therefore, ambiguous.

¶106 Nevertheless, to the extent the Court is permitting recreational use to expand the width of the stipulated right-of-way beyond the paved surface of Seyler Lane, I strongly disagree. The Montana and out-of-state precedents cited above are clear, at least in my view,

that the width of a prescriptive public road is defined by the definite, fixed course that the public actually used during the period of prescription. As we stated in *Portmann*, to "give the fullest recognition to the traditional requirements of adverse possession," the public "may obtain title by adverse possession of that only which it has occupied during the full statutory period." 149 Mont. at 95-96, 423 P.2d at 58 (internal quotation marks omitted). Here, pursuant to the parties' stipulations, the occupied area consists only of "the paved portion" of Seyler Lane. Of course, as explained, a prescriptive road includes an incidental right to use adjacent land—such as shoulders, slopes, and ditches—that is reasonably necessary to support and maintain the roadway. Obviously, without such land, the road would become unusable as a public right-of-way. But I am aware of no authority—and neither PLAA nor the Court nor the Concurrence cites any—which holds that the land needed to support and maintain the beaten path may be transformed into part of the beaten path. That is the crux of my disagreement with our Opinion. In my view, the Court is fundamentally mistaken in holding that the land alongside the beaten path may be used for purposes in addition to simple maintenance and support.

¶107 My conclusion is supported not only by the aforementioned precedents, but also by various statutes which limit where particular public uses may occur within a single right-of-way. Although a public right-of-way may be wide enough to encompass several uses—such as vehicular travel, pedestrian travel, bicycle travel, and maintenance work—this does not mean that all of these uses may occur everywhere within the right-of-way. The public's right to use one area for a specific purpose does not give it the right to use that area for an entirely different purpose. Vehicular travel, for example, is confined to the roadway. *See*

55

§ 61-8-321(1), MCA (requiring vehicles to be operated on the right half of the roadway); § 61-1-101(66), MCA (defining "roadway" as "that portion of a highway improved, designed, or ordinarily used for vehicular travel, exclusive of the berm or shoulder"). Pedestrians are prohibited from walking on the roadway if a sidewalk is available, and are otherwise required to walk "on the shoulder, as far as practicable from the edge of the roadway." Section 61-8-506, MCA. Similar restrictions exist with regard to bicyclists, § 61-8-605, MCA, and snowmobiles, § 23-2-631, MCA.

¶108 The cases the Court cites at ¶ 24 of the Opinion do not support the conclusion that maintenance work by Madison County employees in the area along the paved portion of Seyler Lane gives the public the right to use that same area for other, nonmaintenance purposes. In *McClurg v. Flathead County Commissioners*, 188 Mont. 20, 24, 610 P.2d 1153, 1156 (1980), *Rasmussen v. Fowler*, 245 Mont. 308, 312, 800 P.2d 1053, 1056 (1990), *Swandal Ranch*, 276 Mont. at 234-36, 915 P.2d at 844-45, *Hitshew v. Butte/Silver Bow County*, 1999 MT 26, ¶ 18, 293 Mont. 212, 974 P.2d 650, and *Public Lands Access Assn. v. Jones*, 2004 MT 394, ¶ 33, 325 Mont. 236, 104 P.3d 496, we held that evidence of maintenance by local authorities supports a finding of adversity. We were concerned in these cases with whether a prescriptive right-of-way had been proved, not with how wide it was. As for *Smith v. Russell*, 2003 MT 326, 318 Mont. 336, 80 P.3d 431, this case did not involve a road established by prescription.

¶109 In holding that there is a "single, unified, public road right-of-way," any portion of which may be used by the public for travel, Opinion, ¶¶ 32, 52, the Court disregards long and well-established precedent recognizing that the right to use adjacent land for support and

56

maintenance of a prescriptive public road is *incidental* to the right to travel on that road. While the Court consumes a large portion of today's Opinion faulting the District Court's characterization of this right as a "secondary easement,"[8] Opinion, ¶¶ 18-32, the fact remains that, whatever the right is called, it is *incidental* to the right of travel on the roadway and it is limited to the purpose for which it exists: maintenance and support. This principle is simply an application of the maxim that " '[w]hen an easement or other property right is created, every right necessary for its enjoyment is included by implication.' " *Mattson v. Mont. Power Co.*, 2009 MT 286, ¶ 37, 352 Mont. 212, 215 P.3d 675 (quoting *Sullivan v. Donohoe*, 191 N.E. 364, 365 (Mass. 1934)); *see also Laden v. Atkeson*, 112 Mont. 302, 305-06, 116 P.2d 881, 883-84 (1941) (the right to enter upon the servient tenement for the purpose of repairing an easement is " 'a mere incident of the easement' "). The incidental right of maintenance and support is to be exercised only when necessary and in such a manner as not to needlessly increase the burden upon the servient tenement. *Laden*, 112 Mont. at 306, 116 P.2d at 884; *Shammel v. Vogl*, 144 Mont. 354, 365-66, 396 P.2d 103, 109 (1964); *O'Connor v. Brodie*, 153 Mont. 129, 140, 454 P.2d 920, 926 (1969); *Sharon v. Hayden*, 246 Mont. 186, 189-90, 803 P.2d 1083, 1086 (1990); *Kephart v. Portmann*, 259 Mont. 232, 238, 855 P.2d 120, 124 (1993); *Engel v. Gampp*, 2000 MT 17, ¶ 43, 298 Mont. 116, 993 P.2d 701; *Musselshell Ranch Co. v. Seidel-Joukova*, 2011 MT 217, ¶ 18, 362 Mont. 1, 261 P.3d 570.

¶110 The Court attempts to distinguish these cases on the ground that they involved private easements and not "a county road acquired by prescriptive use." Opinion, ¶ 24. The Court,

---

[8] As noted, Madison County essentially claimed a "secondary easement" in the District Court proceedings. *Supra* ¶ 88.

mistakenly, construes provisions within Title 7 and Title 60 to support this distinction. The law of prescription, however, is governed by this Court's precedents. *See Swandal Ranch*, 276 Mont. at 233, 915 P.2d at 843 ("The elements of prescriptive easement have been defined through case law."). The only distinction our cases have made between public and private prescriptive easements is the element of exclusivity, which is not required to establish a public prescriptive easement.[9] *Heller v. Gremaux*, 2002 MT 199, ¶ 12, 311 Mont. 178, 53 P.3d 1259. Kennedy does not deny that Madison County may access his property to maintain and support the Seyler Lane right-of-way. At issue here is whether common law principles of prescription permit the width of a prescriptive easement, whether private or public, to be expanded beyond the area that was used and occupied during the prescriptive period, such that the area alongside the original traveled way may also be used for travel. Under our precedents, the clear answer to this question is no. *Maynard*, 96 Mont. at 307, 30 P.2d at 95 ("The occupancy or use by the public of one portion of the road does not avail it in its claim to another portion not occupied by it."); *Auchard*, 22 Mont. at 16, 55 P. at 362 (the prescriptive right is "confined to the very way claimed and traveled during the period"). The out-of-state cases discussed above are in accord. As Kennedy points out, "if the area used for maintenance could be transformed into a new traveled way, then the easement could be expanded forever simply by paving over that area, which would create a right to more maintenance, *ad infinitum*." Likewise, the District Court observed in its Conclusions of Law

---

[9] The Court today adopts another distinction: that, unlike private prescriptive easements, the scope of uses *within* public prescriptive easements is broad enough to include reasonably foreseeable public uses. Opinion, ¶¶ 46-51. Although I do not disagree with this holding, I find it irrelevant because the parties here do not dispute the public uses that may occur *within* the stipulated right-of-way.

that the County's "right to use maintenance areas cannot be transformed into a new traveled way. The travel easement could be expanded forever simply by paving the areas used for maintenance which could create a right to use yet more land for lateral and subjacent support. Such a result would be impossible to square with *Portmann* . . . . It also defies common sense."

¶111   Public prescriptive easements are founded on the definite, fixed course established during the prescriptive period. There is an incidental right to use adjacent land as *support* for the traveled way, but there is no authority for our holding that the land used for support and maintenance may also be used by the general public as a supplemental area of travel. In my view, we are misapplying statutory provisions and prescriptive easement law in order to facilitate public access to Ruby River. Stream access laws are for the Legislature to consider and design. House Bill 190, passed by the Legislature in 2009, resulted in a new statute that authorizes any person to gain access to surface waters for recreational use by using (a) a public bridge, its right-of-way, and its abutments, and (b) a county road right-of-way. Section 23-2-312(1), MCA. Other legislation permits fencing within the right-of-way for livestock control or property management, as long as the fencing provides for public passage to surface waters. Sections 7-14-2134(4), 23-2-313(1), MCA. Importantly, this legislation expressly excludes a certain category of public roads from its application: those established through prescriptive use. Section 23-2-312(3), MCA. Our disregard of precedent—justified by a distinction artificially drawn, for the first time, today between private and public easements—upsets the balance achieved by the 2009 Legislature between recreationists and landowners.

## D. Remand is Unnecessary

¶112   Lastly, I do not believe it is necessary to remand this case for a determination of the Seyler Lane right-of-way's width.  Pursuant to the parties' stipulation, the prescriptive public road consists of the paved portion of Seyler Lane and Seyler Bridge, which varies between 20 and 24 feet in width.  PLAA has failed to establish that the public has a right to travel anywhere off the paved portion of the road and bridge.  While the prescriptive road includes an incidental right to use any adjacent land that is reasonably necessary to maintain and support the traveled surface area, the width of that maintenance and support area is not a question presented in this lawsuit.  Kennedy does not dispute that Madison County may access his property to maintain and support the roadway, and Kennedy does not claim that Madison County has exceeded this right.  Thus, in my view, there is no need to remand for a determination of the width of the incidental right of maintenance and support.  What PLAA wants in this lawsuit is to obtain recognition of a right in the general public to travel over the adjacent land to get to the river.  PLAA is clear that it is "not seeking to acquire a new prescriptive easement beyond the existing Seyler Lane right-of-way."   Rather, PLAA contends that the right to access the river is encompassed within the right-of-way to which the parties stipulated.  PLAA has failed to establish any legal basis for such a right, however.  I accordingly would affirm the District Court's judgment as to Seyler Lane and Seyler Bridge.

## II. Access at Lewis Lane and Lewis Bridge

¶113   Lewis Lane and Lewis Bridge are also on Kennedy's land.  In 1910, Kennedy's predecessor dedicated Lewis Lane to Madison County with the following language:

A strip of land thirty feet wide on each side of the center of the County road, as at present laid out, running across the S.E.1/4 of Section 23, in Township 4 South of Range 6 West M.P.M. It is intended to convey by this deed a right of way sixty feet wide and running entirely through said S.E.1/4 of Section 23, for a County road.

The District Court concluded that the public could use this 60-foot-wide right-of-way to reach Ruby River. The court noted that Lewis Bridge is less than 60 feet wide, which leaves room alongside the bridge for the public to walk down to the river and still be within the physical boundaries of the 60-foot-wide easement.

¶114   Kennedy contends that the District Court erred. He argues that the 1910 deed does not express any intent to authorize access to the river for public recreation.[10] This presents a question of deed interpretation. In *Bolinger v. City of Bozeman*, 158 Mont. 507, 493 P.2d 1062 (1972), we agreed with the principle that

> [w]hether or not a particular use amounts to a diversion from that for which the dedication was made depends on the circumstances of the dedication and the intention of the party making it. It has been held that such use is authorized as is fairly within the terms of the dedication and reasonably serves to fit the property for enjoyment by the public in the manner contemplated. In other words, the dedicator is presumed to have intended the property to be used in such way by the public as will be most convenient and comfortable and according to not only the properties and usages known at the time of the dedication, but also to those justified by lapse of time and change of conditions.

158 Mont. at 521, 493 P.2d at 1069 (emphasis and internal quotation marks omitted).

---

[10] The Court faults Kennedy for "fail[ing] to demonstrate that his predecessor did not intend to authorize access to the Ruby River from Lewis Lane for public fishing, wading, hunting or other uses." Opinion, ¶ 60. However, under our precedent, it is not Kennedy's burden to show that his predecessor *did not* intend to grant such access. Rather, the party claiming the easement (PLAA) has the burden to prove the facts necessary to establish the easement, i.e., that Kennedy's predecessor *did* intend to authorize public access to Ruby River for recreation. *Richter v. Rose*, 1998 MT 165, ¶ 35, 289 Mont. 379, 962 P.2d 583.

¶115 Here, Kennedy's predecessor dedicated Lewis Lane without any explicit qualifications or limitations on the use of the road: "It is intended to convey by this deed a right of way sixty feet wide and running entirely through said S.E.1/4 of Section 23, for a County road." Kennedy nevertheless contends that, during the period when his predecessor made this dedication, the public did not have the right to use nonnavigable streams—such as Ruby River—for recreational purposes. *See Herrin v. Sutherland*, 74 Mont. 587, 596-97, 241 P. 328, 331 (1925). As we stated in *Bolinger*, however, the dedicator is presumed to have intended the property to be used in such way by the public as will be most convenient and comfortable and *according to not only the properties and usages known at the time of the dedication, but also to those justified by lapse of time and change of conditions*. 158 Mont. at 521, 493 P.2d at 1069. In this regard, the 2009 Legislature clarified that a person may gain access to surface waters for recreational use by using (a) a public bridge, its right-of-way, and its abutments, and (b) a county road right-of-way. Section 23-2-312(1), MCA. The unqualified language of the 1910 deed is consistent with a dedication for such use.

### III. Kennedy's Takings Argument

¶116 As an alternative to his arguments concerning the public rights-of-way over Seyler Lane and Lewis Lane, Kennedy argues that the District Court's and this Court's recognition of the public's right to engage in recreational use of Ruby River as it flows through his land amounts to an unconstitutional taking of his property. His theory, which is premised on his ownership of the bed of Ruby River, appears to be that if the public has no right to use Ruby River in the first place, then the public has no need to get there by crossing his land alongside Seyler Lane and Lewis Lane.

62

¶117   In this regard, Kennedy asserts that a landowner has the right to control the space above his land.  He cites a number of out-of-state cases for this principle, including *Illinois Central Railroad Co. v. Illinois*, 146 U.S. 387, 452, 13 S. Ct. 110, 118 (1892) (title to the lands under the navigable waters of Lake Michigan "necessarily carries with it control over the waters above them"); *U.S. v. Causby*, 328 U.S. 256, 264, 66 S. Ct. 1062, 1067 (1946) ("[t]he landowner owns at least as much of the space above the ground as he can occupy or use in connection with the land"); *Kaiser Aetna v. U.S.*, 444 U.S. 164, 100 S. Ct. 383 (1979) (owner of private pond had right to exclude the public from boating on the pond); *People v. Emmert*, 597 P.2d 1025, 1027 (Colo. 1979) ("ownership of the bed of a non-navigable stream vests in the owner the exclusive right of control of everything above the stream bed"); and *Butler v. Frontier Telephone Co.*, 79 N.E. 716, 718 (N.Y. 1906) ("space above land is real estate the same as the land itself").  He also cites our 1925 decision in *Herrin*, where we stated:  "[I]t is held uniformly that the public have no right to fish in a nonnavigable body of water, the bed of which is owned privately."  74 Mont. at 596-97, 241 P. at 331.

¶118   Kennedy argues that our 1984 decisions in *Montana Coalition for Stream Access, Inc. v. Curran*, 210 Mont. 38, 682 P.2d 163 (1984), and *Montana Coalition for Stream Access, Inc. v. Hildreth*, 211 Mont. 29, 684 P.2d 1088 (1984), effectively overruled *Herrin*—a point that the State of Montana, which has intervened in this appeal, concedes—and thereby divested landowners of a valuable property right, namely, the right to exclude the public from the waters above privately owned streambeds.[11]  In *Curran*, the Court held that a

---

[11] *See College Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673, 119 S. Ct. 2219, 2224 (1999) ("The hallmark of a protected property interest is the right to

landowner has no right to control the use of the surface waters of a stream flowing through his property to the exclusion of the public, except to the extent of his prior appropriation of part of the water for irrigation purposes. 210 Mont. at 52, 682 P.2d at 170. The Court further held that "any surface waters that are capable of recreational use may be so used by the public without regard to streambed ownership or navigability for nonrecreational purposes." *Curran*, 210 Mont. at 53, 682 P.2d at 171. The Court supplemented this holding in *Hildreth* to include "the bed and banks up to the ordinary high water mark." 211 Mont. at 35-36, 684 P.2d at 1091. The Legislature codified these holdings in 1985. *See* §§ 23-2-301(12), -302(1), MCA.

¶119   Citing *Stop the Beach Renourishment, Inc. v. Florida Department of Environmental Protection*, 560 U.S. 702, 130 S. Ct. 2592 (2010), Kennedy contends that our decisions in *Curran* and *Hildreth* effected an unconstitutional judicial taking of property without just compensation. Citing *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S. Ct. 3164 (1982), he contends that the enactment of statutes based on *Curran* and *Hildreth* amounted to an unconstitutional legislative taking of property. The State responds that these "claims" are barred by the statute of limitations. The State cites § 27-2-207, MCA, which prescribes a limitation on "the commencement of an action" for injury to property. Yet, Kennedy has not commenced an action for injury to property. He has no cross-claims or counterclaims pending. He asserts no claims for damages due to a taking or inverse condemnation of property. He states that he is asserting his takings argument as a *defense* to

exclude others."); *Kafka v. Mont. Dept. of Fish, Wildlife & Parks*, 2008 MT 460, ¶ 51, 348 Mont. 80, 201 P.3d 8 ("the most significant of all the indicia [of property is] . . . the right to exclude").

PLAA's claim that the public has the right to cross his land in order to access and use Ruby River. As we have recognized, "statutes of limitations . . . [are] limitations on actions only and not of defense." *Hagerty v. Hall*, 135 Mont. 276, 280, 340 P.2d 147, 149 (1959). Thus, I believe the State's procedural argument is misplaced.

¶120 Nevertheless, the judicial and legislative takings alleged by Kennedy occurred in 1984 and 1985, when the right of landowners to exclude the public from the waters over privately owned streambeds, recognized 59 years earlier in *Herrin*, was changed by our decisions in *Curran* and *Hildreth* and the ensuing statutes enacted by the Legislature. Kennedy did not own the Ruby River streambed in 1984 or 1985, and thus nothing was taken from him. When he purchased his property in 1993, *Curran* and *Hildreth* were the law of this State, and he thus acquired no right to exclude the public from using Ruby River during anytime when he has owned his property. Simply acknowledging, in the context of the present lawsuit, the rights held by the public under *Curran* and *Hildreth* does not effect any taking of Kennedy's property.

**CONCLUSION**

¶121 "[S]ignificant controversy has existed related to public access to streams and rivers from county road and bridge rights-of-way." Laws of Montana, 2009, ch. 201, preamble to House Bill 190. In 2007 and 2008, "a group of stakeholders met to address the controversy and agreed in principle that a legislative solution was preferable." Laws of Montana, 2009, ch. 201, preamble to House Bill 190. That legislative solution took the form of House Bill 190, which the Legislature passed in 2009. Nearly every member of the 2009 Legislature voted in favor of the bill; the final vote was 96 to 3 in the House and 48 to 2 in the Senate.

65

The bill struck a balance, allowing the public to gain access to surface waters for recreational use at public bridges and county road rights-of-way, while allowing landowners to run their fences up to the edge of the bridge as long as the fences did not prevent public passage to surface waters. The bill expressly excluded a certain category of public roads from its application: those established by prescriptive use.

¶122 With today's decision, this Court nullifies the exclusion of prescriptive easements from the 2009 legislation and alters the balance struck by the Legislature. We do so by ignoring a century of precedent recognizing that the public may obtain a prescriptive easement over only the land which the public adversely possessed—confined to the way actually occupied during the prescriptive period—and that the incidental right of support and maintenance extends to only the adjacent land that is reasonably necessary for these purposes and must be exercised in such a way as not to needlessly increase the burden on the servient estate. The Court effectively grants a public prescriptive easement where the Legislature has determined none should exist. I believe the Court's decision lacks any support in precedent and embroils this Court in a controversy that we are not properly suited to resolve. I would apply our well-settled principles of prescriptive easements and hold that PLAA has failed to establish a public right of passage from Seyler Lane to Ruby River.

¶123 I dissent from the Court's decision to the contrary.

/S/ LAURIE McKINNON

Justice Jim Rice, concurring in part and dissenting in part.

¶124 Much has already been said in the preceding opinions, and I am loath to contribute to the complexity of the case, but I believe the Court's easement analysis is fundamentally flawed and that easement law will be significantly reordered by the Opinion in a manner inconsistent with longstanding principles.

¶125 Citing only to foreign authority, the Court states that "the general rule" is that "*the width* of a public prescriptive roadway extends beyond the traveled portion of the road to include areas necessary for its support and maintenance." Opinion, ¶ 25 (emphasis added). The Court further holds that "*the width* of a county road or bridge acquired by prescription must be sufficient to encompass the incidents necessary to enjoying, supporting and maintaining the roadway." Opinion, ¶ 30 (emphasis added); *see also* ¶ 26. I disagree that the width or area of an easement is so determined. The width of a roadway easement obtained by prescription, as the Court notes but does not enforce, is "'determined as a question of fact *by the character and extent of its use . . . .*'" Opinion, ¶ 28 (quoting *Portmann*, 149 Mont. at 95, 423 P.2d at 58 (emphasis added)). As *Portmann* further explains about public highway prescription cases, "'the public may obtain title by adverse possession of *that only which it has occupied* during the full statutory period.'" *Portmann*, 149 Mont. at 95, 423 P.2d at 58 (citation omitted) (emphasis added). The precise area of a public prescriptive easement is that which the public *used* or *occupied* during the prescriptive period, as determined by the evidence. This is the law of Montana, consistent with the statutory directive that the "extent of a servitude is determined by . . . the nature of the enjoyment by which it was acquired." Section 70-17-106, MCA.

67

¶126 Then, "'[w]hen an easement or other property right is created, every right necessary for its enjoyment is included by implication.'" *Mattson v. Mont. Power Co.*, 2009 MT 286, ¶ 37, 352 Mont. 212, 215 P.3d 675 (citation omitted). As the Court notes, a public road obtained by prescriptive use "contemplates the general public's use" of additional area necessary for "repairs and maintenance." Opinion, ¶ 24. This is so, because in addition to the easement itself, those "necessary incidents" without which the easement cannot be enjoyed must accompany the easement. "The right to enter upon the servient tenement for the purpose of repairing or renewing an artificial structure constituting an easement, is called a 'secondary easement,' a mere incident of the easement that passes by express or implied grant or is acquired by prescription." *Sharon v. Hayden*, 246 Mont. 186, 190, 803 P.2d 1083, 1086 (1990) (citation omitted). About necessary incidents, we have likewise explained that "[t]hese rights are in the nature of a 'secondary easement,' i.e., '[a]n easement that is appurtenant to the primary or actual easement; the right to do things that are necessary to fully enjoy the easement itself.'" *Mattson*, ¶ 37 (citing *Black's Law Dictionary* 587 (Bryan A. Garner ed., 9th ed., West 2009)). Although the Court eschews the term "secondary easement," this has long been fundamental easement law, as explained in ¶ 109 of Justice McKinnon's dissenting opinion.

¶127 However, the Court has departed from these principles and has instead created a new "super easement," or what is denominates as a "single, unified, public road right-of-way," Opinion, ¶ 32, wherein the necessary incidents of the easement's enjoyment, and the area associated with the necessary incidents, become part of the easement width itself— expanding the area of the easement beyond that actually acquired by the public's use or

68

occupancy. *See* Opinion, ¶¶ 26, 32. It cites inapplicable statutes as authority for doing so, as noted by Justice McKinnon. Dissent, ¶ 95. The error here is that the necessary incidents are of a different character than the acquired easement, and do not merge with it. The incidents are not part of "[t]he extent of a servitude" because they are not "the nature of the enjoyment by which it was acquired." Section 70-17-106, MCA. They are acquired only "'by implication.'" *Mattson*, ¶ 37 (citation omitted). "Of course, nothing passes by implication as incidental to the grant of an easement except that which is reasonably necessary to its fair enjoyment." *Mattson*, ¶ 37. Incidents, as an implied interest, cannot merge with an easement because they are subject to change, both expansion and contraction, depending upon the circumstances that are necessary for the easement's enjoyment.

¶128 Nonetheless, the Court declares the additional area or width accommodating the incidents of a publicly acquired prescriptive easement has the character of the easement itself, such that all other "uses that are reasonably foreseeable" may be made, Opinion, ¶ 51, and that "all uses that are permissible to the public under the laws of this state are permissible uses," Opinion, ¶ 47 (citing *Lovvorn*, 701 P.2d at 144). The Court thus uses authority standing for the proposition that a publicly acquired prescriptive easement can be used for all public purposes, and then extends that proposition to any area necessary for the implied incidents as well, opening the entirety of the area that is incidentally necessary for the easement's use to full public enjoyment of "all uses that are permissible." Opinion, ¶ 47. I believe this is a sweeping departure from established law and agree with ¶ 100 of Justice McKinnon's dissent in this regard. If the area incidentally necessary can be so used, then, as Kennedy argues, "the easement could be expanded forever" because an additional area will

always be incidentally necessary for use of the primary area. If "[f]oot travel over . . . embankments and abutments" is reasonably foreseeable, as the Court posits, Opinion, ¶ 52, I surmise that most any other use would be as well. I dissent from this holding under Issue 1, and to those portions of Issue 3 expanding the necessary incidents of an easement to other uses and enjoyment.

¶129 I agree with the Court that recreational use should likewise be considered in determining the area of the easement that was acquired by the public. I join the Court in remanding for consideration of that evidence under Issue 2, but I would limit that remand to the easement principles discussed above. Because Seyler Lane is a public road acquired by prescription, and PLAA's claim is based upon prescriptive use, the issue on remand—"the scope of a public road right-of-way established by prescripti[on]," Opinion, ¶ 51— necessarily requires application of these principles. I join the Court on Issues 4 and 5.

/S/ JIM RICE